UNITED STATES of America,
Plaintiff,

v.

STATE OF LOUISIANA, Jimmie H. Davis, C. C. Aycock, J. Thomas Jewel, as Members of the Board of Registration of the State of Louisiana, and Hugh E. Cutrer, Jr., Director and ex officio Secretary of the Board of Registration of the State of Louisiana, Defendants.

Civ. A. No. 2548.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Nov. 27, 1963.
Dissenting Opinion Dec. 31, 1963.

West, District Judge, dissented.

Robert F. Kennedy, Burke Marshall, Washington, D. C., Louis Lacour, New Orleans, La., John Doar, Washington, D. C., for plaintiff.

Jack P. F. Gremillion, Carroll Buck, Harry J. Kron, Jr., Baton Rouge, La., Henry Roberts, Jr., Weldon Cousins, John Jackson, New Orleans, La., Thomas W. McFerrin, Baton Rouge, La., for defendants.

Before WISDOM, Circuit Judge, and CHRISTENBERRY and WEST, District Judges.

WISDOM, Circuit Judge.

A wall stands in Louisiana between registered voters and unregistered, eligible Negro voters. The wall is the State constitutional requirement that an applicant for registration "understand and give a reasonable interpretation of any section" of the Constitutions of Louisiana or of the United States. It is not the only wall of its kind, but since the Supreme Court's demolishment of the white primary, the interpretation test has been the highest, best-guarded, most effective barrier to Negro voting in Louisiana.[1]

1. The following authorities are cited by author and page only:

Carter, The Angry Scar (1959); Caskey, Secession and Reconstruction in Louisiana (1938); 1 Chambers, History of Louisiana (1925); 1 Davis, History of Louisiana (1960); Evans, A Study in the State Government of Louisiana

When a Louisiana citizen seeks to register, the Parish Registrar of Voters may ask the applicant to interpret the provision, "The Supreme Court and the Court of Appeal, and each of the judges * * may also in aid of their respective jurisdictions, original, appellate, or supervisory, issue writs of mandamus, certiorari, prohibition, quo warranto, and all other needful writs". Or, the registrar may ask the applicant to interpret a less technical but more difficult provision, constitutionally, such as, "Every person has the natural right to worship God according to the dictates of his own conscience." [2] In giving this test, the registrar selects the constitutional section and he must be satisfied with the explanation. In many parishes the registrar is not easily satisfied with constitutional interpretations from Negro applicants.

We hold: this wall, built to bar Negroes from access to the franchise, must come down. The understanding clause or interpretation test is *not* a literacy requirement. It has no rational relation to measuring the ability of an elector to read and write. It is a test of an elector's ability to interpret the Louisiana and United States Constitutions. Considering this law in its historical setting and considering too the actual operation and inescapable effect of the law, it is evident that the test is a sophisticated scheme to disfranchise Negroes. The test is unconstitutional as written and as administered.

## I.

 The United States brings this action against the State of Louisiana and the directors and members of the Louisiana Board of Registration. In Section 601(b) of the Civil Rights Act Congress specifically authorizes such a suit. When an official of the State or of a subdivision of the State is found to have discriminated against United States citizens in violation of 42 U.S.C.A. § 1971(a), "the act or practice shall also be deemed that of the State and the State may be joined as a party defendant". 42 U.S.C.A. § 1971 (c). See United States v. Alabama, 1960, 362 U.S. 602, 80 S.Ct. 924, 4 L.Ed. 982; United States v. Dogan, 5 Cir. 1963, 314 F.2d 767, 771; Kennedy v. Lynd, 5 Cir., 1962, 306 F.2d 222, 228, cert. den'd 1963, 371 U.S. 952, 83 S.Ct. 507, 9 L.Ed.2d 500; United States v. Atkins, 5 Cir. 1963, 323 F.2d 733. Section 601 is clearly appropriate legislation under the Fifteenth Amendment, to say nothing of other sources of constitutional authority, and in United States v. Fox, E.D.La. 1962, 211 F.Supp. 25, *appeal pending,* the court summarily rejected the State's attack on the constitutionality of the section. See also United States v. Raines, 1960, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524.

Independently of Section 601(b), "The obligations which [United States] is under to promote the interests of all and to prevent the wrongdoing of one resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court". In re Debs, 1894, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092. When the alleged wrongdoing is based on a State law which is contrary to the superior authority of the United States Constitution, the Nation, as well as the aggrieved individuals, is injured. In such a conflict with the State the power of the Nation to protect itself and to go into its own courts to prevent the States from destroying federally protected

(1910); Ficklen, History of Reconstruction in Louisiana (1910); 4 Fortier, History of Louisiana (1904); Howard, Political Tendencies in Louisiana (1957); Kendall, History of New Orleans (1922); Landry, The Battle of Liberty Place (1955); Lonn, Reconstruction in Louisiana (1918); McGinty, Louisiana Redeemed (1941); Marr, A Historical Review of the Constitutions of Louisiana 1912–13 Proc.La. Bar Ass'n; Phelps, Louisiana (1905); Powell, History of Louisiana Constitutions, Volume 1, Part 1, Louisiana Law Institute, Projet of a Constitution for the State of Louisiana (1954); Randall, The Civil War and Reconstruction (1953); Shugg, Origins of Class Struggle in Louisiana (1939); Simkins, History of the South (1953); Woodward, Origins of the New South (1951).

2. Article VII, Section 2 and Article I, Section 4, La.Const. of 1921, LSA.

rights of citizens derived from the Constitution would seem to be implicit in the Supremacy Clause and inherent in our federal system.

When a private litigant invokes the Fourteenth and Fifteenth Amendments, he must be able to show that State action is involved in the denial of his rights. Anomalously, he cannot sue the State, but must sue agents of the State on the theory that if the act to be enforced is unconstitutional, it is not the act of the State. Ex parte Young, 1908, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714. This necessary fiction to accommodate the Eleventh Amendment provides no basis for any argument that the State cannot be made a party to this action. Here, no private litigant but the Nation itself is attacking the constitutionality of the laws of Louisiana. Louisiana therefore is the real party at interest and a proper party defendant. The Eleventh Amendment has no application to an action brought by the United States in its sovereign capacity. Principality of Monaco v. Mississippi, 1934, 292 U.S. 313, 329, 54 S.Ct. 745, 78 L.Ed. 1282.

The State and its agent, the Board of Registration, have the power and duty to prescribe rules and regulations governing the administration of voter qualification laws in Louisiana.[3] The Board

has the power to remove at will any Parish Registrar of Voters.[4]

The court has jurisdiction under 42 U.S.C.A. § 1971, 28 U.S.C.A. § 1345, and 28 U.S.C.A. § 2281. Since the suit challenges the validity of provisions of the State Constitution and certain statutes and presents substantial constitutional questions, it is a proper case to be heard by a three-judge court. 28 U.S.C.A. § 2281.

## II.

Under the Constitution of Louisiana, registration, which is a prerequisite to voting in any election, is conducted in each parish by a registrar of voters. La.Const. Art. VIII, § 1(b). Except in Orleans Parish, the registrar is appointed by the police jury or other governing body of the parish. La.Const. Art. VIII, § 18; L.S.A.–R.S. 18:1.[5] Permanent registration is mandatory for parishes containing a municipal corporation of more than 100,000 population, and optional for other parishes. L.S.A.–R.S. 18:231, 18:249.

The Constitution of Louisiana, Article VIII, Section 1(d), as amended in 1960, provides, in part:[6]

"He [a voter] shall be a person of good character and reputation, attached to the principles of the Con-

---

3. Article VIII, Section 18, La.Const. of 1921, as amended in 1962 and LSA–R.S. 18:191.

4. Article VIII, Section 18, La.Const. of 1921.

5. The registrar of voters for the Parish of Orleans is appointed by the Governor. La.Const. of 1921, Article VIII, Section 18, LSA–R.S. 18:1.

6. As originally adopted in 1921, Article VIII of the Constitution contained two separate interpretation tests. Section 1 (c) provided that persons able to read and write "shall also be able to read any clause in this Constitution, or the Constitution of the United States, *and give a reasonable interpretation thereof.*" Section 1(d) provided that persons unable to read or write could register if "able to *understand and give a reasonable interpretation* of any section of either Constitution when read to him by the registrar * * *." (Emphasis add-

ed.) In 1961, the test in Section 1(c) was deleted entirely as was the opening phrase of Section 1(d), which had made the latter section applicable only to illiterates. The result is that the test originally designed for illiterates is now the test applicable to every registrant, and the literacy requirements of Section 1(c) (filling out the form, etc.) are now applicable to every applicant.

LSA–R.S. 18:35 repeats verbatim the interpretation test as it appeared in Article VIII, Section 1(c) of the Constitution. Although that language has been deleted from the Constitution it remains in the statute. LSA–R.S. 18:36 repeats the test for illiterates that appeared in Article VIII, Section 1(d) of the Constitution before 1960, and which is now applicable to literate registrants as well. Section 36 has not been changed; thus according to the statute, illiterates can register, although under the Constitution it appears that they cannot register.

stitution of the United States and of the State of Louisiana, and shall be *able to understand and give a reasonable interpretation* of any section of either Constitution when read to him by the registrar, and he must be well disposed to the good order and the happiness of the State of Louisiana and of the United States and must understand the duties and obligations of citizenship under a republican form of government." (Emphasis added.)

Title 18, Section 35 of the Louisiana Revised Statutes provides, in part:

"Applicants for registration shall also be able to read any clause in the Constitution of Louisiana or of the United States and give a reasonable interpretation thereof."

The United States attacks the understanding and interpretation requirement as violative of 42 U.S.C.A. § 1971, the Civil Rights Act, and of the Fourteenth and Fifteenth Amendments to the Constitution of the United States.

### III.

■ A. There is no license for the loose statement that in our constitutional system the qualification of voters is "exclusively" committed to the States. See, for example, Darby v. Daniel, S.D.Miss. 1958, 168 F.Supp. 170, 176. More accurately, the States, under Article 1, Section 2 of the Constitution and the Seventeenth Amendment, are free to establish voting qualifications—only if the qualifications do not transgress the United States Constitution. Ex parte Clarke, 1879, 100 U.S. 399, 25 L.Ed. 715; Lassiter v. Northampton County Bd. of Elections, 1959, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072. The books are filled with examples of state election laws and practices found to transgress constitutional guaranties. Guinn v. United States, 1915, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340; Lane v. Wilson, 1938, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281; United States v. Classic, 1941, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368; Davis v. Schnell, 1949, S.D.Ala., 81 F.Supp. 872,

aff'd 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093. In *United States v. Classic*, a "Louisiana" case, the Supreme Court, in sustaining federal indictments against state election officials for falsely certifying returns in a *congressional* election, said:

"While, in a loose sense, the right to vote for representatives in Congress is sometimes spoken of as a right derived from the states, [citations omitted] this statement is true only in the sense that the states are authorized by the Constitution, to legislate on the subject as provided by § 2 of Art. I, to the extent that Congress has not restricted state action by the exercise of its powers to regulate elections under § 4 and its more general power under Article I, § 8, clause 18 of the Constitution 'to make all laws which shall be necessary and proper for carrying into execution the foregoing powers.' See Ex parte Siebold, 100 U.S. 371 [25 L.Ed. 717]; Ex parte Yarbrough, supra, [110 U.S. 651], 663, 664 [4 S.Ct. 152, 158, 28 L.Ed. 274] * * *."

In ex parte Yarbrough, 1884, 110 U.S. 651, 663, 4 S.Ct. 152, 158, 28 L.Ed. 274, cited in *Classic*, the court stated: "[I]t is not true * * * that electors for members of Congress owe their right to vote to the State law in any sense which makes the exercise of the right to depend exclusively on the law of the State."

■ B. Three provisions of the United States Constitution deny plenary and exclusive power to the States to determine voting requirements and give special protection to a citizen against discrimination in the electoral process. Two are mandates expressly prohibiting discriminatory state action. The third is an affirmative grant of power to the United States.

The first and most important is the Fifteenth Amendment. It is clearly and simply expressed: "The right of citizens of the United States to vote shall not be denied or abridged by the United States

or by any State *on account* of race, color, or previous condition of servitude". Uncomplicated by phrases freighted with history back to Magna Carta, the Fifteenth Amendment imposes on courts the unshirkable duty of inquiring into legislative purpose and striking down a fairseeming law that, "on account of race", is in fact a discriminatory device to deprive Negroes of their vote. "The Fifteenth Amendment * * * clearly shows that the right of suffrage was considered to be of supreme importance to the national government, and was not intended to be left within the exclusive control of the States." Ex parte Yarbrough, 1884, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274.

■ Second, the Fourteenth Amendment, primarily by the "equal protection" clause, prohibits discriminatory voting qualifications. Nixon v. Herndon, 1924, 273 U.S. 536, 47 S.Ct. 446, 71 L. Ed. 759. As the Supreme Court stated in another context, however: Although this is "a more explicit safeguard of prohibited unfairness than 'due process of law.' * * * discrimination may be so unjustifiable as to be violative of due process. * * * Liberty under law extends to the full range of conduct which the individual is free to pursue, and it cannot be restricted except for a proper governmental objective." Bolling v. Sharpe, 1954, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884.

■ Third, Article 1, Section 4 of the Constitution empowers Congress to "make or alter" the "[t]imes, Places and Manner of holding Elections for Senators and Representatives * * * prescribed in each State by the Legislature thereof." [7] Such Congressional authority extends to registration, a phase of the electoral process unknown to the Founding Fathers but today a critical, inseparable part of the electoral process which must necessarily concern the United States, since registration to vote covers voting in federal as well as in state elections.[8] In

7. Art. 1, Section 2, and the Seventeenth Amendment provide that in elections of United States Representatives and Senators "[t]he Electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures". Traditionally, these provisions establish the basis for the proposition that the States alone possess the right to establish qualifications for voting. See Ervin, Literacy Tests for Voters: A Case Study in Federalism, 27 Duke L.Cont.Prob. 481 (1962); Werdegar, The Constitutionality of Federal Legislation to Abolish Literacy Tests, 30 Geo.Wash.L.Rev. 723 (1962) (Werdegar, however, accepts the constitutionality of a congressional standard for literacy); Ritz, Free Elections and the Power of Congress over Voter Qualifications, 49 Am.Bar Jour. 949 (1963); Note, Use of Literacy Tests to Restrict The Right to Vote, 31 Notre Dame L.Rev. 250 (1956). For recent writings in which the authors conclude that a congressional anti-literacy test statute is constitutional, see Van Alystyne, "The Administration's Anti-Literacy Test Bill", 61 Mich.L.Rev. 805 (1963); Maggs and Wallace, Congress and Literacy Tests, 27 Duke L. & Cont. Prob. 510 (1962); Bement, Congressional Authority to Restrict the Use of Literacy Tests, 50 Cal.L.Rev. 265 (1962);

Note, The Constitutionality of Federal Anti-Literacy Test Legislation, 46 Minn. L.Rev. 1076 (1962). See also 1 Crosskey, Politics and The Constitution 524–537 (1953).

8. The Civil Rights Commission has unanimously found, to the surprise of none, that the registration procedure is the principal means of disfranchising Negroes. 1961 Civil Rights Report 133–38. A leading authority writes: "In the South registration assumes special importance because of the peculiar regional suffrage qualifications. Registration authorities determine whether applicants meet literacy and understanding tests and thus have functioned as the principal governmental agency for Negro disfranchisement. * * * Commonly the statutes attempt to vest finality of decision in the local registration officials and make appeals from their decisions difficult. In states whose suffrage qualifications involve wide discretion in their application, this finality of decision may re-enforce abuses of discretion. * * * Every local registration officer is a law unto himself in determining the citizen's possession of literacy, understanding, and other qualifications. * * * Louisiana's battery of literacy, understanding, and character requirements * * * for the

**360**

Ex parte Siebold, 1880, 100 U.S. 371, 25 L.Ed. 717 the Supreme Court relied on Article 1, Section 4, in sustaining a statute providing, among other things, for federal registrars, supervisors, in registration offices. See also In re Supervisors of Election, C.C.Ohio 1878, 23 Fed. Cas. 430 (No. 13628). In United States v. Manning, W.D.La.1963, 215 F.Supp. 272, 277, this Court upheld the registration provisions of the Civil Rights Act of 1960: "[N]othing in the language or history of the Tenth Amendment gives the State exclusive sovereignty over the election processes against the Federal government's otherwise constitutional exercise of a power." See McColloch v. Maryland, 1819, 4 Wheat. 316, 17 U.S. 316, 4 L.Ed. 579 and United States v. Darby, 1941, 312 U.S. 100, 124, 61 S.Ct. 451, 85 L.Ed. 609.

 The "necessary and proper" clause, Article 1, Section 8, Clause 18, gives Congress full authority to legislate under Article 1, Section 4 (or any other constitutional grant of power); the Fourteenth Amendment, Section 5, specifically grants power to Congress to pass "appropriate legislation" to prevent the denial of equal protection of the laws; the Fifteenth Amendment, Section 2, specifically grants power to Congress to pass "appropriate legislation" to guarantee that the right to vote shall not be abridged on account of race. Ex parte Virginia, 1879, 100 U.S. 339, 25 L.Ed. 676, makes it clear that the "appropriate legislation" clause of the Fourteenth and Fifteenth Amendments is as broad as the "necessary and proper clause", as construed in McCulloch v. Maryland, 1899, 4 Wheat. 316, 17 U.S. 316, 4 L.Ed. 579. The Supremacy Clause, Article VI, subordinates any conflicting state legislation to congressional legislation. The totality of implied powers these sections grant to

---

white population mean absolutely nothing. They exist only as a bar to Negro registration." Key, Southern Politics 560, 563, 573 (1949). "[The findings of the Civil Rights Commission] and a survey of cases filed under Section 1971 will make even clearer that it is abuses of discretion by registrars, operating under state laws allowing them to test applicants by subjective standards, that is felt to be the problem." Van Alystyne, Anti-Literacy Test Legislation, 61 Mich.L.Rev. 805, 813 (1953). See also McGovney, The American Suffrage Medley 61, 66–73 (1949); Price, The Negro Voter in the South 14–17 (1957).

"Apathy", an unctuous, self-excusing word comes trippingly to the tongue to rationalize the small Negro registration in some of the parishes in Louisiana. There are undoubtedly a number of reasons besides discrimination for the disparity between Negro and white registration. Thus, in a recent study the authors write: "About 28 per cent of the voting age Negroes in the South were registered to vote in 1958, as compared to about 60 per cent of the voting age whites. It would be a gross error to attribute this substantial disparity to legal and political discrimination alone, though unquestionably official discrimination is a factor, for Southern Negroes overwhelmingly possess the historical heritage of low social status, relatively small incomes, and limited educations received in inferior schools. These attributes are associated with low voter turnout among *all* populations, regardless of skin color or region. Moreover, the low status, income and education of many southern whites foster racial prejudice. Thus poverty and ignorance may have a double-barrelled effect on Negro political participation by decreasing the Negroes' motivation and ability to participate while increasing white resistance to their doing so. The low voting rates of Negroes in the South may result to a large extent from these factors, as well as from direct political or legal discrimination by the white community." Mathews and Prothro, Political Factors and Negro Voter Registration in the South, 57 Am. Pol.Sc.Rev. 355 (1963). See also Mathews & Prothro, Social and Economic Factors and Negro Voter Registration in the South, 57 Am.Pol.Sc.Rev. 24, 39–44 (1963). But discriminatory registration laws and practices are the most potent weapons to keep Negro voting down. Price, The Negro and the Ballot in the South (1959); Brown, American Suffrage (1960); Mangum, The Legal Status of the Negro (1960). There was no apathy in the Negro electorate in 1897 when Negro registration equalled white registration in Louisiana. And it is a fair inference that Negro interest in voting, accelerated as it must have been by the civil rights explosion of recent years, is no less in 1963 than it was in 1897.

Congress are full authority for Congress to enact the Civil Rights Act or other appropriate legislation to regulate elections (including registration) under Article 1, Section 4, and to protect the integrity of the electoral process under the Fourteenth and Fifteenth Amendments. United States v. Classic, 1941, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368; Burroughs v. United States, 1934, 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484; Ex parte Yarbrough, 1884, 110 U.S. 651, 663, 4 S.Ct. 152, 28 L.Ed. 274.

C. "It is said [more often in the past than in recent years, we interpolate] that when the meaning of language is plain we are not to resort to evidence in order to raise doubts. That is rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if its exists". Boston Sand and Gravel Co. v. United States, 1928, 278 U.S. 41, 48, 49 S.Ct. 52, 53, 73 L.Ed. 170 (Holmes, J.) "Of course one begins with the words of a statute to ascertain its meaning, but one does not end with them". Massachusetts Bonding & Ins. Co. v. United States, 1956, 352 U.S. 128, 138, 77 S.Ct. 186, 191, 1 L.Ed.2d 189 (Frankfurter, J., dissenting).

In going beyond the verbal surface of the Louisiana interpretation test, we have sought to eschew inquiry into motive. A federal court's proper respect for the State and the judiciary's due regard for the legislative process, among other reasons, compel this restraint. Candor compels the admission however that in this case the line between the *motive* of the lawmakers and the *purpose* of law is blurred. Blur or not, the court cannot, on the one hand, carry out its judicial function of giving effect to legislative intent, or, on the other hand, invalidate the law under a reasonable construction fair to the framers, without first determining the purpose of the law.

As we see it, *purpose* carries the meaning of Coke's "true reason" for the law in the light of the situation at which it is aimed. Heydon's Case, 3 Co.Rep. 7a, 7b, 76 Eng.Rep. 637 (1584). "[L]aws

are not abstract propositions. They are expressions of policy arising out of specific situations and addressed to the attainment of particular ends. * * * And so the bottom problem is: What is below the surface of the words and yet fairly a part of them?" Frankfurter, Some Reflections on the Reading of Statutes, 47 Col.L.Rev. 527, 533 (1947). Purpose then, or the "true reason" for the law, determined as objectively as possible, is an essential part of the context within which a law must be read, if the Court is to appraise fairly the validity of the law. Llewellyn stated this well:

> "If a statute is to make sense, it must be read in the light of some assumed purpose. A statute merely declaring a rule, with no purpose or objective, is nonsense. * * * [When there are] ideas consciously before the draftsmen, the committee, the legislature, * * * talk of 'intent' is reasonably realistic; committee reports, legislative debate, historical knowledge of contemporary thinking or campaigning which points up the evil or the goal can have significance." Llewellyn, The Common Law Tradition 374 (1960).

See also N.A.A.C.P. v. Button, 1963, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405; Jordan v. Hutcheson, 4 Cir. 1963, 323 F.2d 597; Howell, Legislative Motive and Legislative Purpose in the Invalidation of a Civil Rights Statute, 47 Va.L.Rev. 439 (1961).

To Louisianians familiar with the history of their state, it must seem an exercise in futility for the Court to labor the proof of the true reason for the understanding or interpretation test. However, two decisions by three-judge courts in this circuit put a high premium on the Court's ascertaining the true reason for the test. These are Davis v. Schnell, S.D.Ala.1949, 81 F.Supp. 872, aff'd mem. 1949, 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093, and Darby v. Daniel, S.D.Miss. 1958, 168 F.Supp. 170. In *Davis v. Schnell*, the court, in holding the Alabama understanding clause unconstitu-

**362**

tional, based its decision, in good part, on the discriminatory purpose of the law as evidenced by its history. The Court, in *Darby v. Daniel,* held the Mississippi understanding clause constitutional and distinguished *Davis v. Schnell,* in part because the plaintiff had failed to show that Mississippi's understanding clause was intended to discriminate against Negroes.

**D.** It is not unusual for courts to look beyond the face of a statute.

A court may find that a law non-discriminatory on its face is discriminatorily administered. "Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and unequal hand, so as practically to make unjust and illegal discriminations between persons of similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution." Yick Wo v. Hopkins, 1886, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220.

The legislative purpose and inevitable effect of a law non-discriminatory on its face may be decisive in determining the unconstitutionality of the law. In Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110, the Supreme Court had before it an Alabama statute which changed the shape of Tuskeegee "from a square to an uncouth twenty-eight-sided figure." No one has ever doubted that a state legislature has the power to determine municipal boundaries, and a long line of cases, going back to Luther v. Borden, 1849, 7 How. 1, 12 L.Ed. 581, and continuing through Colegrove v. Green, 1946, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432, strongly argued for the conclusion that gerrymandering of election districts was a "political" problem. In holding the law unconstitutional under the Fifteenth Amendment, the Supreme Court based the decision on the statutory objective and the effect of removing from Tuskeegee all save four or five of its 400 Negro voters:

"When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right. This principle has had many applications. It has long been recognized in cases which have prohibited a State from exploiting a power acknowledged to be absolute in an isolated context to justify the imposition of an 'unconstitutional condition.' What the Court has said in those cases is equally applicable here, viz., that 'Acts generally lawful may become unlawful when done to accomplish an unlawful end, United States v. Reading Co., 226 U.S. 324, 357 [33 S.Ct. 90, 57 L.Ed. 243], and a constitutional power cannot be used by way of condition to attain an unconstitutional result.' Western Union Telegraph Co. v. Foster, 247 U.S. 105, 114 [38 S.Ct. 438, [439], 62 L.Ed. 1006, 1 A.L.R. 1278]." 364 U.S. at 347–348, 81 S.Ct. at 130, 5 L.Ed.2d 110.

In Grosjean v. American Press Co., 1936, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660, a Louisiana law appeared to be simply a graduated tax on newspaper and theatre advertising. Underneath the surface, as the evidence showed, was the legislative purpose to punish New Orleans newspapers for criticism of Governor Huey Long. With nothing in the statute to show the object of the tax and little in the record to show how it was generated, or how it worked, the Supreme Court went beyond appearances and struck down the tax as in effect an abridgment of First Amendment freedom of the press in violation of the due process clause of the Fourteenth Amendment. Cases too numerous to cite sustain taxation of newspapers. As the Court stated:

"[The tax] is bad because, *in the light of its history and of its present setting,* it is seen to be a deliberate and calculated device in the

guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guarantees." 297 U.S. at 250, 56 S.Ct. at 449, 80 L.Ed. 660.

In this case, too, we must go into the "history" and "present setting" of a law non-discriminatory on its face. In doing so, we bear in mind a maxim quoted appropriately in this circuit many times in recent years, a maxim from one of the Supreme Court decisions outlawing the Oklahoma grandfather clause: "[The Constitution] nullifies sophisticated as well as simple-minded modes of discrimination. It hits onerous procedural requirements which effectively handicap exercise of the franchise by the colored race although the abstract right to vote may remain unrestricted as to race." Lane v. Wilson, 1939, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281.

## IV.

To obtain some necessary pages of history, more valuable than volumes of logic, as Holmes has said, we sacrifice brevity.

The Louisiana interpretation test and its current variant, the citizenship test, are best understood as the latest, but perhaps not final, members of a long, logically connected series of socio-political events. These are rooted in the State's historic policy and the dominant white citizens' firm determination to maintain white supremacy in state and local government by denying to Negroes the right to vote.

A. There was, of course, no problem in colonial and territorial times; the *Codes Noir*, from the 1724 Code to Act 33 of the Territorial Legislature of 1806, disfranchised Negroes. Louisiana became a state in 1812. Its first Constitution set the pattern. It limited the franchise to "free white male citizen[s]" who had paid state taxes or purchased land from the United States within six months prior to the election. For thirty-three years this constitutional limitation kept the ballot chiefly in the hands of landowners and merchants, disfranchised two-thirds of the electorate, and favored New Orleans and the southern parishes over the rest of the State. The Constitution of 1845, in many respects a progressive and broadly democratic document, did away with the tax-paying qualification for voters and established universal suffrage for free white males, regardless of wealth and literacy, but limited the vote to citizens of the United States who had resided in Louisiana for two years, and barred the vote to paupers and men in military service. The next Constitution, adopted in 1852, broadened the suffrage qualifications by lowering the state residential requirement to one year, and introduced registration of voters, a progressive step many years in advance of most states. This Constitution required registration for Orleans Parish and made it optional with the legislature for the other parishes.

Thus, from the *Code Noir* of 1724 until 1864, the organic law of the state ordained that only free white males could vote or hold office. This was in a state where there were thousands of free men of color. Many of these were well educated and owned slaves. Except for suffrage, they possessed the civil and legal rights of white citizens.[9]

---

9. In 1810 New Orleans had 8,001 white persons, 5,727 free persons of color, and 10,824 slaves. *Aggregate Amount of Persons Within the United States in 1810.* (Wash.D.C.1811) p. 82. A battalion of *gens de couleur* fought at the Battle of New Orleans in 1815. Rousseve, The Negro in Louisiana 24–29 (1937). In 1830 there were 16,710 free persons of color and 109,588 slaves in Louisiana. In 1860 Louisiana free men of color owned real property and slaves valued at $50,-000,000. Carter, 253. A person of color was presumed to be free. Adelle v. Beauregard, 1810, 1 Mart. (O.S.) 183. Bureau of the Census, Negro Population, 1790–1915 (Wash.1918). In general see Rousseve, The Negro in Louisiana 24–29, 44–45 (1937); Stahl, The Free Negro in Ante-Bellum Louisiana, 25 La.Hist.Quart. 301 (1942); Woodson, Free Negro Heads of Families in the United States in 1830 (1925); Burns, The Black Code, 5 Layola L.J. 15 (1923). Historically, therefore,

The Constitutional Convention of 1864 was the first convention in Louisiana to consider Negro suffrage. During the federal occupation of New Orleans, General N. P. Banks, Commander of the Gulf Department, at the direction of President Lincoln, ordered an election of delegates to a constitutional convention. Negroes could not vote for the delegates and were not represented in the Convention. It was attended by delegates from the federally occupied part of the State only: Orleans and eighteen southern parishes which recognized Michael Hahn as Governor. (Henry W. Allen was the Confederate Governor for the rest of the State.) The Constitution of 1864 abolished slavery and provided for free public schools for all children between six and eighteen years, regardless of race, but retained the previous limitation of suffrage to white males. In the early stages of the convention a strong sentiment existed against granting suffrage to the Negroes, and the delegates actually adopted a resolution declaring that the legislature should never pass a law authorizing Negroes to vote.[10] Later in the session, the delegates established a voting qualification, without amending the suffrage ordinance restricting the vote to white males. This was based on an intelligence test, in the interest of permitting Negro suffrage. The resolution in question authorized the legislature "to pass laws extending suffrage to such other persons, citizens of the United States, as by military service, by taxation to support the Government, or by intellectual fitness, may be deemed entitled thereto."[11] The word "Negro" was not contained in the resolution as proposed in the Convention or in the ordinance as adopted and, at the time, which was before the adoption of the Civil War Amendments, it was generally thought that Negroes were not citizens. Nonetheless, in the debates over the resolution a number of delegates denounced it as a "nigger resolution", and at least one delegate stalked out of the Convention in protest against Negroes being allowed to vote.[12]

The Constitution of 1864 required the registration of *all* voters in the State. In 1867 the State Board of Registration, making its first report, showed 45,189 white and 84,527 Negro registrants. The male population of voting age in Louisiana in 1860 was 94,711 whites and 92,502 Negroes.[13]

Racial relations in Louisiana deteriorated rapidly. In the fall of 1865 the Democrats in Louisiana adopted resolutions "that this is a Government of white people, made and to be perpetuated for the exclusive benefit of the white race", and declared the Constitution of 1864 a creature of fraud.[14] Radical Republi-

color and not education or anything else has always been determinative of a voter's qualifications in Louisiana.

10. Ficklen, 71; Caskey, 128; Carter, 253–255.

11. President Lincoln, in keeping with his plan for gradual reconstruction and Negro suffrage by stages, had suggested to Governor Hahn for his "private consideration, whether some of the colored people may not be let in; as for instance, the very intelligent and especially those who have fought gallantly in our ranks." See 1 Fortier, Louisiana (Biographical Edition 1914) 485–7; Carter, 253–255. President Lincoln devoted most of his last public address, April 13, 1865, to reconstruction in Louisiana. He urged approval of the new state government as a means of getting the State again into "a proper practical relation with the Union". Con-

gress did not approve it. Evans, 42. The Louisiana Supreme Court held that the Constitution of 1864 and legislation under it was only "provisional in character". Police Jury v. Burthe, 1869, 21 La.Ann. 325.

12. Debates in Convention, 1864, 450; Ficklen, 72.

13. Report of the Board of Registration to the General Assembly of Louisiana (1869). See Woodward, The Burden of Southern History 99 (1961).
 The Civil Rights Act of March 2, 1867, 14 Stat. 428, required a registration of all voters of "whatever race, color, or previous condition." No one could be registered, however, "who had participated in the rebellion", and a loyalty oath had to be taken by each registrant.

14. Ficklen, 109.

cans, refusing to recognize the existing Democratic Government in Louisiana and adopting the Sumner theory that Louisiana was reduced to the status of a territory and as such was entitled to a territorial delegate to Congress, met in convention and called an election for November 6, 1865, to elect a delegate. Henry Clay Warmoth, later Governor, generally regarded in Louisiana histories as a carpetbagger, was elected as the delegate—without opposition.[15] In that election, such as it was, for the first time in the history of the State, Negroes voted freely.

Ominous events progressively increased the friction between the races in the years between the Constitutions of 1864 and 1868. In 1864, relatively peacefully, the Free State Party attempted to establish a government "responsive to loyal white people; the demobilized Confederates, an administration which would restore Louisiana to its ante-bellum condition, except that peonage would replace slavery".[16] By 1865 Confederate veterans had returned in number and in an orderly election that year defeated the Free Staters and gained control of the legislature, mainly by opposing Negro suffrage.[17] The legislature and police juries promptly enacted new Black Codes which reduced the Negro to a "condition which lay between peonage and serf-

dom"[18] and intensified the activities of Republicans and Northern radicals for Negro suffrage. July 30, 1866, a bloody riot took place in New Orleans at Mechanics Institute. This "massacre" was provoked, it has been said, by "the attempt of some irresponsible white radicals to transfer the franchise from Confederate veterans to freed men".[19] In 1867 the Louisiana legislature rejected the Fourteenth Amendment. "There followed, as night the day, military reconstruction."[20]

In 1868 General Philip H. Sheridan, Commander of the Fifth Military District of Louisiana and Texas, called a constitutional convention to meet the conditions Congress imposed on the former States of the Confederacy: suffrage regardless of race and ratification of the Fourteenth Amendment. In the election of delegates to the convention, Confederate veterans and Democratic officeholders were barred from the polls. This was the first and last Louisiana constitutional convention to which Negro delegates were admitted; the president of the convention and forty-nine of the ninety-eight delegates were Negroes. In the 1868 Constitution Negroes finally received the right to vote and to hold office. This Constitution disfranchised all persons who had participated directly or indirectly in the War[21] on the Confeder-

15. Ficklen, 109–115; 4 Fortier, 94; Bowers, The Tragic Era 363 (Sentry. 1962) See Warmoth's self-serving autobiography, War, Politics, and Reconstruction (1930). Ironically, the election was meaningless, except for its effect on Warmoth's career. Congress did not recognize either Warmoth or the two Louisiana senators.

16. Shugg, 211.

17. Shugg, 211; Powell, 369.

18. Shugg, 213. The most severe laws were enacted by the police juries, not the legislature. Fleming, Documentary History of Reconstruction 279–81 (1906). See also Randall, 724–30.

19. Shugg, 216; McGinty, 6; 1 Kendall, 305–314; Ficklen, 175; Caskey, 219–31. A. P. Dostie, an active white Free Stater and Republican leader, who campaigned for Congress, unsuccessfully, as the "Robespierre of the Revolution", was

killed, along with thirty-four Negroes; over 200 were wounded. The *Congressional Report of the Select Committee on the New Orleans Riots* concluded that it was a "massacre" plotted and perpetuated in cold blood. H.R.Rep. 39 Cong. 2d Sess., No. 16 (1866). No historian has endorsed that judgment. Shugg, 217. But see DuBois, Black Reconstruction in America 464 (1935) and Reed, Life of A. P. Dostie 286–330 (1868).

20. Shugg, 218. See also Howard, 73. "The reconstruction of Louisiana prolonged the civil war between North and South and precipitated within the state first a social revolution and then a counter-revolution. Each phase was marked by a new constitution which changed, directly or indirectly, the dispensation of power." Shugg, 196.

21. "The new suffrage law was the most stringent, perhaps, in its defranchising

ate side and, pouring salt on open wounds, required, as a condition to voting, a certificate from Confederate soldiers and Democratic officeholders that "the late rebellion" was "morally and politically wrong".[22] The Constitution of 1868 desegregated the schools, adopted the bill of rights, rejected a literacy test, and prohibited discrimination in public conveyances and places of public accommodation. This was all "that was needed to strengthen the determination of Southern whites to establish white supremacy, at whatever cost. The Constitution of 1868, therefore, instead of closing the breach between whites and blacks, served only to widen it." [23]

As a result of the disfranchisement of many former Confederate soldiers and the enfranchisement of Negroes, the 1868 election resulted in the election of Warmoth as Governor, and of Oscar J. Dunn, a Negro ex-slave, as Lieutenant Governor. Between 1868 and 1896, a number of Negroes held high office in the State: two congressmen, six high state officials, thirty-two state senators, ninety-five state representatives, and one United States Senator, who was not seated; [24] P. B. S. Pinchback served briefly as Governor.

The years from 1864 to 1876 in Louisiana were years of violence and disorder, notwithstanding the presence of federal troops during these years. In 1873 at Colfax, Grant Parish, fifty-nine Negroes and two white persons were killed.[25] After the Colfax riot additional federal troops were sent to Louisiana and stationed at various points to aid officials in keeping order. Louisiana became an armed camp. In 1874 six white Republican officeholders of Red River Parish were killed, after they had surrendered and had agreed to leave the State.[26] Elections were a farce, since "Governor [Kellogg] appointed the registrars, and through them returned his friends to the legislature"; "politicians bribed legislators for party and parish favors, and business men and corporations bribed the politicians for economic priv-

clauses to be found in the constitutions of all the Southern states." Evans, 45.

22. Article 99, in part, provided: "The following persons shall be prohibited from voting and holding any office: * * * All persons who are estopped from claiming the right of suffrage by abjuring their allegiance to the United States Government, or by notoriously levying war against it, or adhering to its enemies, giving them aid or comfort, but who have not expatriated themselves, nor have been convicted of any of the crimes mentioned in the first paragraph of this article, are hereby restored to the said right, except the following: Those who held office, civil or military, for one year or more, under the organization styled 'the Confederate States of America;' those who registered themselves as enemies of the United States; those who acted as leaders of guerrilla bands during the late rebellion; those who, in the advocacy of treason, wrote or published newspaper articles or preached sermons during the late rebellion; and those who voted for and signed an ordinance of secession in any State. No person included in these exceptions shall either vote or hold office until he shall have relieved himself by voluntarily writing and signing a certificate setting forth that he acknowledges the late rebellion to have been morally and politically wrong, and that he regrets any aid and comfort he may have given it; and he shall file the certificate in the office of the secretary of state, and it shall be published in the official journal." This Article was amended in 1870 to prohibit only those persons from voting or holding office who had been convicted of treason, or of a crime punishable by imprisonment in the penitentiary.

23. Powell, 370.

24. In 1873 the Kellogg legislature elected Pinchback to the United States Senate. After a contest extending over many years the Senate gave him $20,000 for expenses, but refused to seat him. "[E]ducated mulattoes such as Oscar Dunn and P.B.S. Pinchback [were] a type which was the peculiar product of antebellum racial relations in Louisiana." Shugg, 221.

25. Chambers, 675; Simkins, 287; Lonn, 240-45; Howard, 76; Carter, 202-209.

26. Lonn, 265-67; 1 Chambers, 682; Simkins, 287; Howard, 76; Carter, 225; Sen.Exe.Doc., 43 Cong., 2 Sess., No. 17, House Repts., 43 Cong., 2 Sess., No. 261, 773-80.

ileges". [27] During most of the years between 1866 and 1877 there were two governors and two legislatures. The Republican governors and their elected associates were maintained in office only by the Returning Board and federal troops. Representative white citizens considered it a civic duty [28] to belong first to The Knights of the White Camelia, a secret organization equivalent to the Ku Klux Klan in other states, and, later, to join the White League, a statewide organization which openly advocated white supremacy [29] in a published platform. September 14, 1874, the Crescent City (New Orleans) White League, which was organized militarily, led by influential citizens, successfully fought a pitched battle in New Orleans against 3000 of Kellogg's Negro militia, 1000 Metropolitan Police [30] under General Longstreet, and several hundred federal troops. The

27. Shugg, 224, 226.

28. "The best men of the State were soon enrolled in its [White League] ranks." Phelps, 376. In 1875, when General Sheridan called the leaders of the White League "banditti", the Catholic Archbishop in New Orleans, the Episcopal Bishop of Louisiana, the Methodist Bishop at New Orleans, the leading Jewish Rabbi and the leading Presbyterian Rector in New Orleans promptly came to their defense in a joint public statement. 4 Fortier, 175. Not long after, the white people in New Orleans stepped to the tune of the "March of those Louisiana Banditti" and danced the "People Rights Quick Step" and the "White League Waltz". Landry, 80.

29. "It is impossible to estimate the strength or to exaggerate the importance of an organization like the White League. When the New Orleans *Bulletin,* put its enrollment at fourteen thousand men, 'organized and armed', a North Louisiana paper [Minden Democrat, August 29, 1874] claimed that there were at least ten thousand men who belonged to it in that region." Shugg, 230. According to Chambers, the first organization was formed at Opelousas in St. Landry in April 1874. Carter, at 224, states that it was originated in Winn Parish. Cross (2 Biographical and Historical Memories 57. Goodspeed, 1892) claimed it for Caddo. There were a number of organizations, some very loosely organized, which became White Leagues or were associated with *the* White League formed in New Orleans July 2, 1874. For example, there was The White Man's Club or Caucasian Club, organized in Franklin, in St. Mary's Parish by Judge Alcibiade De Blanc as early as 1867; leagues in Winn and Grant in July 1874; "Bulldozers" in East Feliciana, West Feliciana, East Baton Rouge, Morehouse, and Ouachita; the Innocents, most of whom were of Italian extraction. The White Leagues were especially strong in Southwest Louisiana, St. Landry, St. Martin, St. Mary, Lafayette, and New Iberia. The New Orleans White League was formed by the same men who had organized the Crescent City Democratic Club in 1868. This was a secret society composed of members of the Chalmette Club, a social club which merged with the Boston Club in 1873. The Crescent City White League, under General Fred N. Ogden, was organized into two regiments of infantry and one regiment of artillery; in the parishes the leagues were often only political clubs. Associated with the Crescent City White League was the First Louisiana Regiment, known as "Louisiana's Own", a secret organization intended to serve as part of Governor McEnery's militia. (The Federal Government recognized William Kellogg and not John McEnery as Governor.) See Landry, 52–68; Lonn, 254–307; 1 Kendall 359–375; 1 Chambers, 679; Phelps, 376; 4 Fortier, 132–62; 1 Fortier, Louisiana (Biographical Ed. 1914) 314, 605–609; Carter, 224–229; 1 Davis, 271; Lestage, The White League and Its Participation in Reconstruction Riots, 18 La.Hist.Quart. 358 (1928); House Repts. 43, Cong., 2 Sess., No. 101, Part ii. 206–7.

Negroes and radical Republicans formed the Loyal League, the Black League (under Caius Caeser Antoine, Negro Lieutenant-Governor), The "Republican Alliances" and other protective organizations, but no organized leagues comparable with the White Leagues. However, in the Loyal League the "strictest discipline was enforced and personal injury, even death, was the penalty for voting a Democratic ticket." Fleming, Documentary History of Reconstruction 350 (1907). 57,300 Negroes were enrolled in 94 clubs, under strict discipline. Ficklen, 186. In 1867 the Union League Clubs of New York and Philadelphia sent organizers into Louisiana to form Union and Liberty Leagues among the Negroes. Landry, 10; Carter, 52, 62; Lonn, 255–57.

30. The Metropolitan Police was a military force equipped with guns and cannon, un-

White League took over complete control of the City, then the Capitol of Louisiana, and established in the Statehouse Acting Governor Penn and, later, Governor McEnery. President Grant came to the rescue with sufficient troops to support Governor Kellogg's regime, and the White Leaguers returned to their homes without incident. Some years later, Liberty Place Monument was erected to the memory of the sixteen members of the White League who were killed. September 14 is still officially celebrated annually in New Orleans with public ceremonies as the day the tide turned in Louisiana against the Negroes, carpetbaggers, and scalawags who had been in control of state and local government.[31]

The Battle at Liberty Place had an important effect on the election of 1876 when the "Redeemers", the White Democrats under Francis T. Nicholls, defeated the Negro Republican candidate, S. B. Packard. Throughout the State, and especially in New Orleans, armed members of the White League policed the election. Governor Nicholls, who ran as the White League's choice but who had also promised Negroes the continued enjoyment of their constitutional privileges, managed to attract enough Negro ballots to win by a substantial, if contested, vote. Governor Kellogg's Returning Board and, later, the Republican Legislature, declared S. B. Packard elected. Nicholls and Packard were each inaugurated. January 9, 1877, the White League numbering 6000, marched on the Cabildo in New Orleans, where Packard's troops were stationed. The troops surrendered. President Grant, unwilling to take sides because of the pending Hayes-Tilden controversy, ordered the status quo preserved. For four months armed White Leaguers patrolled the streets of New Orleans.[32]

Louisiana was the last of the Southern States to be freed from carpetbag government. In April 1877 President Hayes, as part of the Hayes-Tilden compromise, removed federal troops from Louisiana and recognized the Nicholls administration as the legal government of the state.[33] These events foreshadowed the "lily white" primary, marked the emergence of the Democratic party in the south as "the institutionalized incarnation of the will to White Supremacy," [34] and led inexorably to the "grandfather"

der a commission of five, including three Negroes. Originally it had jurisdiction over New Orleans, Jefferson City, and Saint Bernard Parish. Later, the Governor was authorized to use it anywhere in the State. McGinty, 9; Phelps, 366; 1 Chambers 669.

31. "The 14th of September, 1874, though apparently barren of results, was really the blow that broke the fetters imposed upon by the Reconstruction Acts of 1867. On January 9, 1877, the people rose again to achieve the freedom of their State, and the chains, half-sundered in 1874, fell to the ground." 4 Fortier, 162. "The Battle of Liberty Place in 1874 changed the tide of opinion, brought the end of Reconstruction in the South, and started the Southern people on their way to the great prosperity which they now enjoy." Landry, 193. These opinions are typical of the views of all the orthodox Louisiana historians.

32. Landry, 190–192.

33. Woodward, 23–30; Haworth, The Hayes-Tilden Disputed Election of 1876

(1906); Woodward, Reunion and Reaction: The Compromise of 1877 and the End of Reconstruction (1951); Carter, 326–341; Simkins, op. cit. 293–94; 4 Fortier, 191; Randall, 876 (1953); Lonn, 495–525 (1918); McGinty, 55–151. The Commission appointed by President Hayes to investigate the Nicholls-Packard election, declared Nicholls, the Democratic candidate, legally elected, but it gave the electoral votes to Hayes, instead of to Tilden. The Nicholls legislature, which the President's commission recognized, elected Henry M. Spofford to the United States Senate; the unrecognized Packard legislature elected William P. Kellogg. The Senate refused to seat Spofford and seated Kellogg. President Hayes pensioned off Packard as a United States Consul.

34. Cash, The Mind of the South 128 (1941). For an appraisal of these events which most white Louisianians would regard as unorthodox, see Howard, 77–83. For example: "[T]he Negro became the object of white terror based primarily on political grounds. The inescapable con-

clause, the understanding or interpretation test, and the tricky registration application form as techniques to avoid another Reconstruction.

In 1879, with the State firmly in the control of the White League, another Constitution was adopted. "Its chief objectives apparently, were to put 'white supremacy' back on a firm foundation and bring to an end the oppressive taxation, excessive public spending, and corrupt administration that had plagued the people for a decade." [35] This was before the understanding clause was invented. The solution for the Negro problem devised by the Convention was to transfer powers to the Governor from the legislature and the police juries (county commissioners).[36] The public accommodations section and most of the provisions in the 1868 Constitution favorable to Negroes were eliminated, but the Constitution of 1879 did not restrict the Negro's right to vote. This may have been because of fear of another federal intervention or because the Negro-White unification movement under General Beauregard had collapsed.[37] Article 188 of that Constitution provided, "No qualification of any kind for suffrage or office, nor any re-

straint upon the same, on account of race, color or previous condition shall be made by law."

In the eighties and until 1898 Negroes in Louisiana continued to vote and to have their vote solicited by all parties. This is not surprising. In 1888 there were 127,923 Negro voters and 126,884 white voters on the registration rolls in Louisiana; [38] the population of the state was about fifty per cent Negro.

In the election of 1892, the Louisiana Lottery issue split both parties. Murphy J. Foster, a Democrat, was the successful candidate for governor, but the Negro vote was a decisive factor in Governor Foster's favor in many parishes, a disquieting circumstance necessarily regarded as a mixed blessing. In a four-man race, the Democrats polled only 79,388 votes against a total of 98,647 cast for the Republicans and the newly organized people's Populist party.[39] The next election, in 1896, was the turning point that led directly to the disfranchisement of the Negro in Louisiana. In that election, Governor Foster, running for re-election, defeated John N. Pharr, the choice of a Fusion party of "National" (Lily white) Republicans, Regular (Radi-

clusion is that in 1878 the Republican party was not given a free ballot in a fair election. * * * A planter—merchant elite re-established itself in the political sun, but it could stay there only through gaining support of farmer groups and a portion of the Negro groups, or through intimidation of either or both." Howard, 82.

35. Powell, 386; McGinty, 152–180.

36. "The South had not yet solved the problem of disfranchising the illiterate, ignorant Negro by organic law nonviolative of the Fourteenth and Fifteenth Amendments to the United States Constitution. Until such a solution was arrived at, other means had to be employed-intimidation, permission, subtle suggestion that to vote the white man's ticket was most inconducive to the black man's health, call it what you will. * * * [The Constitution of 1879 partly met] the threat of a possible return to black domination * * * [by] the constitutional provision which lodged in the hands of the chief executive of the state

extraordinary appointive powers. The Governor named all local and state officials whose election by popular suffrage was not specifically enjoined by the Constitution. He appointed the members of the police jury of every parish, a select body of representative citizens upon whom developed the enacting of laws and ordinances affecting parish affairs, as well as the determining of just what the rate of local taxation would be to meet parish needs." 1 Chambers, 697. See also Evans, 53, Woodward, 54.

37. General P. G. T. Beauregard was chairman of a biracial committee pledged to obtain political equality for Negroes, desegregated public schools, and desegregated places of public accommodation. Williams, The Louisiana Unification Movement of 1873, 2 Jour.Sou.Hist. 349 (1945).

38. Statement of Registered Voters in the State of Louisiana.

39. Report of the Secretary of State 1902, 562.

cal) Republicans, Populists, and sugar-growers dissatisfied with low tariffs of 1894. It was a bitterly fought election.[40] "The main issue * * * was the problem of Negro suffrage." [41] Again the Negro vote was decisive in many parishes. Again, Foster, who ran on a "white supremacy" platform, had his heaviest majority in parishes where the Negro registration was the heaviest.[42]

At this point, the handwriting on the wall could be read as easily in Louisiana as it was read earlier in Mississippi: something had to be done about Negro Suffrage. Local issues or national issues could split the Democratic party wide open, giving the Negroes the balance of power. And the political ecology of Louisiana made factionalism inevitable. In Louisiana, as in Mississippi and Alabama, there were, and still are, fundamental social and economic differences between the areas controlled by a plantation economy and the areas controlled by a small farm economy. Two potent

40. "There are those who maintain to this day that John N. Pharr * * * was really elected. * * * The near success [of the Fusion party] * * * shaped [the] future course [of the Democrats] to the end that elections in Louisiana should be determined by the white vote and not black." 1 Chambers, 698. "The contest over the Governorship in 1896 showed that until the Negro vote was eliminated from the electorate, there was always some danger of the election of a Republican Governor, and made apparent to the Democratic leaders the advisability of a new Constitution." Marr, 229, 246. Judge Robert H. Marr was chairman of the Committee of Seventy, which sponsored the "Convention of the White People [Leagues] of Louisiana" in Baton Rouge, August 24, 1874, and constituted an inner circle of the White League. He called the meeting of the White League to order at Henry Clay Statue on Canal Street just before the Battle of Liberty Place.

41. Howard, p. 99. See also Havard, Herbele, and Howard, The Louisiana Elections of 1960, 23–25 (1963) ; 1 Fortier, Louisiana (Biographical Edition 1914) 427–432. The legislature had proposed an amendment to the Constitution adding literacy and property requirements for voting. The Fusionists were against it. See Uzee, The Republican Party in the Louisiana Election of 1896, 2 La.Hist. 332 (1961).

42. Pharr carried all but a few of the white parishes in the State ; Foster carried 23 of the 27 parishes in which more Negroes than whites were registered to vote. "The Fusionists were sure the Democrats had stuffed the ballot boxes and insured victory." Howard, 99. Every election commissioner in the parishes with Negro majorities was a trusted Foster Democrat. "The Ring opened up a special office in New Orleans to purchase Negro votes at $12.50 per vote." Uzee, 332. In many parishes the number of votes exceeded the number of registered voters. Uzee, 339. The editor of the New Orleans Times-Democrat was uneasy: "It is true that we win these elections but at a heavy cost, and by the use of methods repugnant to our idea of political honesty and which must, in times, demoralize the people of Louisiana." Times-Democrat, January 11, 1898. Woodward comments: "The remedy, declared the reformers was the disfranchisement of the Negro. * * * 'The remedy suggested here is to punish the man who has been injured * * * to prevent the Democratic election officials from stealing their votes' ". Woodward, 327.

As Woodward, Shugg, Howard, Key, Heard and many others have pointed out, the struggle was not only for white supremacy, but a struggle as to *which whites* should be supreme." Howard, 105. In Louisiana the predominantly white parishes were fighting, not only Negro domination, but also oligarchic domination of the State by New Orleans and the southern parishes. Pharr's greatest strength lay in the hill-farmer parishes of Northern Louisiana, the Florida parishes, and the sugar-bowl. Foster received 90 per cent of the vote in the delta parishes, from Madison south to West Feliciana, and in the upper Red River parishes of Caddo and Bossier. A similar situation existed in Mississippi and Alabama where the cleavage was sharp between the counties in the Black Belt and those in the Hill country. See Howard, 82–105 ; Havard, Herbele, and Howard, The Louisiana Elections of 1960, 21–25 (1963) ; Fenton and Vines, Negro Registration in Louisiana, 51 Am.Pol.Sc.Rev. 704 (1957). Uzee, The Republican Party in the Louisiana Election of 1896, 2 La. Hist. 332 (1961). See also 1 Fortier, History of Louisiana (Biographical Edition 1914) 429–432.

additional facts of political life aggravate divisiveness in Louisiana: (1) North Louisiana is solidly Protestant, South Louisiana predominantly Catholic; (2) New Orleans and the rest of the State are like oil and water. See Fenton and Vines, Negro Registration in Louisiana, 51 Am.Pol.Sc.Rev. 704 (1957). By 1898, the moral as well as dollar-and-cents costs of buying victory at the polls were finally more than the purchasers were willing to pay.

Promptly after the important election of 1896, Governor Foster requested the Legislature to call a constitutional convention. Former Governor Nicholls, then Chief Justice of the Supreme Court of Louisiana, called the Convention to order February 8, 1898. Judge Thomas J. Semmes, Chairman of the Judiciary Committee of the Convention and a former president of the American Bar Association, described the purpose of the Convention: "We [meet] here to establish the supremacy of the white race, and the white race constitutes the Democratic party of this State." [43] The Convention of 1898 "interpreted its mandate from the 'people' to be, to disfranchise as many Negroes and as few whites as possible." [44]

The understanding clause, invented by Mississippi a few years before as an alternative to a literacy test, was strongly advocated by many of the delegates.[45] After considerable debate, however, *"per-*

---

43. Journal of the Constitutional Convention of 1898, 374.

44. J. A. Snider (Bossier) summed up the Convention's policy, as one to "disfranchise as many Negroes and as few whites as possible". New Orleans Times-Democrat, Feb. 8, 1898. A year later, Thomas J. Kernan, one of the distinguished members of the Convention, used these identical words to describe the object of the Convention. Kernan, The Constitutional Convention of 1898, Proc.La.Bar Ass'n for 1899, at p. 51. Conscious of the moral dilemma and the paradox, Kernan also observed: "By the irony of fate, this ultra conservative convention was called upon as its first chief duty to do the most radical thing known to legislation; to falsify the accepted teaching of history and roll back the wheels of political revolution without bloodshed; to take away the ballot from almost, if not quite, a majority of the voters of the State." Ibid. at 56. "Ernest B. Kruttchnitt * * * on taking the chair, stated that the great purpose for which the Convention had been called together was * * * the elimination of the Negro vote, while granting the suffrage to every white man in the State". Marr, 219. There is a brief but excellent account of the convention in Eaton, The Suffrage Clause of the New Louisiana Constitution, 13 Harv.L.Rev. 279 (1899). See also 3 Fortier, Louisiana (Biographical Ed. 1914) 262–264.

45. There was never any doubt as to the purpose of the "understanding clause" in any of the Southern States which adopted it. Judge S. S. Calhoun, President of the Mississippi Convention of 1890, wrote, in regard to the Convention:

"There was revolution. There is no manhood nor honesty in attempting to disguise. Our people said to the miserable hucksters and their ignorant Negro dupes, 'You shall rule a great State no longer. * * * Come down, get out!' And they did come down and get out and the white people of Mississippi took charge of her polity." Calhoun, The Causes and Events that Led to the Calling of the Constitutional Convention of 1890, 6 Miss.Hist.Soc.Pub. 105 (1902). "Of two ills Mississippi chose the lesser. She has exchanged an organic malady for a functional disorder. The Convention substitutes a desiccated for a diseased electorate. * * * Southern civilization no longer requires evil acts to secure good government." McNeilly, The Constitutional Convention of 1890, 6 Miss.Hist. Soc.Pub. 136–38 (1902). Senator J. Z. George is usually considered as the originator or chief sponsor of the clause. The delegate from Grenada was not enthusiastic about the contribution of Senator J. Z. George to the electoral process: "The mephitic vapour that arises from the section actually stinks in the nostrils of an honest man and makes one feel like stuffing the registration books." The press of the state was filled with editorials and letters which dubbed the provision an "odious section", "a shameless fraud", "a disgraceful absurdity", "the mongrel hotchpotch suffrage scheme", or "the flyblown section". Wharton, The Negro in Mississippi 213 (1947). See also 2 Rowland, Mississippi, The Heart of the South 246–255 (1925). In the South Carolina Convention, the next to adopt the understanding clause, Ben Tillman

*suaded that the understanding clause was 'based on fraud', the Louisiana Conven-* tion rejected it and invented the 'grandfather clause' ".[46]

dealt with the problem with characteristic candor: "Some have said there is fraud in this understanding clause. Some poisons in small doses are very salutary and valuable medicines. * * * *The [registration] officer is responsible to his conscience and his God; he is responsible to nobody else.* There is no particle of fraud *or illegality in it. It is just showing partiality, perhaps,* (laughter) *or discriminating. Ah, you grin."* (Emphasis added.) Journal of the Constitutional Convention of the State of South Carolina, 469 (1895). In the Virginia Convention Senator Carter Glass was equally outspoken: *"Discrimination!* Why that is precisely what we propose; that *exactly is what this convention was elected for".* Proceedings and Debates of the Constitutional Convention, 1901–02, II, 3076. See Woodward, 332–35. See also Monnet, The Latest Phase of Negro Disfranchisement, 26 Harv.L.Rev. 42 (1912); Smith, Negro Suffrage in the South, Studies in Southern History and Politics 231–56 (1914); Porter, A History of Suffrage in the United States, 208–18 (1918).

46. Woodward, 332. Frank P. Stubbs, a delegate from Ouachita, was quoted as saying: "To adopt the understanding clause would be 'to send word' to the registrars to do what you will not do yourself. We are told that it is more honorable to permit highway robbery than to rob a hen roost. I see no honor in either". New Orleans Times-Democrat, March 20, 1898. Mr. Phanor Breazeale of Nachitoches opposed the plan as a certain instrument of fraud. Judge A. V. Coco of Avoyelles wrote to the Picayune, "The very reason of this Convention is, in morals, dishonest, for its purposes are to do in an indirect way what we cannot do directly. * * * This unconstitutional measure we propose to enact through constitutional and honest means. Well, I say it cannot be done through constitutional and honest means." Eaton, The Suffrage Clause in the New Louisiana Constitution 13 Harv. L.Rev. 279, 290 (1899).

In explaining his vote against the grandfather clause, Dr. H. Dickson Bruns, whose father wrote the appeal to the "Citizens of New Orleans" which precipitated the Battle of Liberty Place, voted against Section 5 because he considered it an "unAmerican doctrine that a man shall be a voter because his father or grandfather once possessed that right * * * [It] violates justice, law and morals, and I have faith that such violation inexorably evolves in the fulness of time its own punishment upon the violator, be it a man, a party, or a State". Journal, Constitutional Convention of 1898, 142. William O. Hart, an eminent lawyer, voted against it because he "consider[ed] Section 5 in conflict with the Constitution of the United States". Id. 144 W. H. Wise agreed: "Section 5 is unconstitutional, and vicious, and undemocratic in principle." Id. 147. Charles T. Soniat voted against it because it was "glaringly unconstitutional, undemocratic, and unAmerican. * * * You are discriminating against certain colored citizens in the very teeth of the Constitut[ion] * * * this law, conceived in secret and born in the still hours of last night * * * will breed discord and strife, and will be in a few years execrated by the very parties who now support it on its final passage." Id. 141. Judge Coco thought that the section was a "weak and transparent subterfuge and unmanly evasion of the Constitution of the United States". Id. 146.

The press was highly critical. The New Orleans Times-Democrat, March 8, 1898, reported that "indignation over the suffrage ordinance is limited to no section of the State". Again, March 29, 1898, "North Louisiana joins hands with Central and Southern Louisiana in protest." Part of this protest was based on the fear that too many white persons would also be disfranchised. The Times-Democrat for February 8, 26, 27, 1898 reported that the understanding clause was rejected in favor of the grandfather clause, because most of the delegates feared that it would place too much power in the hands of the registrar.

Both Louisiana Senators, McEnery and Caffrey, expressed the opinion that the Louisiana suffrage provision was unconstitutional. Porter, History of Suffrage in the United States, 213 (1918).

"Most of the discussions of the Convention seemed to have been about Section 5 of Article 197 [the grandfather clause]. Many of the gentlemen expressed the view that that section was in conflict with the Amendments of the Federal Constitution. Mr. Semmes, in voting for the suffrage ordinance, said * * * 'that he had no scruples of conscience as to its morality. * * * In view of the fact that these amendments were never constitutionally adopted, it is hard to understand what ques-

Under Article 197 of the 1898 Constitution,[47] in order to register, an applicant had to meet educational and property qualifications—unless exempted by the "grandfather" clause. The educational test required the applicant to be able to read and write and demonstrate the ability to do so by filling out the application form without assistance. The property test required the applicant to own property assessed at $300 and to have paid the taxes due on the property.[48] The grandfather clause exempted persons entitled to vote on or before January 1, 1867, or the son or grandson of such person.[49] A similar provision exempted immigrants who came to this country after January 1, 1867. At the time, forty per cent of the registered voters in Louisiana were illiterate and most of the Negroes could not meet the property requirement. The result was disfranchisement of almost all of the Negro voters and of some twenty to thirty thousand white voters.[50] Alcée Fortier, one of Louisiana's most respected historians, writing in 1904, succinctly stated the legislative purpose of the grandfather clause:

"The purpose of this section, known as the 'Grandfather Clause' was to allow many honorable and intelligent but illiterate white men to retain the right of suffrage, and the purpose of the educational or property qualification was to disfranchise the ignorant negroes who had been a menace to the civilization of the State since the adoption of the Fifteenth Amendment to the Constitution of the United States." 4 Fortier, History of Louisiana 235.

On accepting the chair as President of the Convention, Ernest B. Kruttschnitt, a leading lawyer in New Orleans and a veteran of the White League, did not

tion of conscience is involved in the advocacy of measures by means of which the operation of those two amendments may be defeated. The sole question is what is the surest and most practicable way to bring about that defeat.' Mr. Semmes' prophesy [that it would withstand constitutional attack] has been fully justified by the results. The suffrage provisions of the Constitution of 1898 have worked well. Under the authority of the Primary Election Law, to annex additional qualifications for party suffrage, the Democratic State Central Committee has added the qualification 'white' and thus politically wiped out the Negro". Marr, 245.

47. Section 5 of Article 197 provides in part: "No male person who was on January 1st, 1867, or at any date prior thereto, entitled to vote under the Constitution or statutes of any State of the United States, wherein he then resided, and no son or grandson of any such person not less than twenty-one years of age at the date of the adoption of this Constitution, and no male person of foreign birth, who was naturalized prior to the first day of January, 1898, shall be denied the right to register and vote in this State by reason of his failure to possess the educational or property qualifications prescribed by this Constitution; provided, he shall have resided in this State for five years next preceding the date at which he shall apply for registration, and shall have registered in accordance with the terms of this article prior to September 1, 1898, and no person shall be entitled to register under this section after said date."

48. Negro males in Louisiana over twenty-one who owned property in excess of $300, and were thus qualified to register, numbered 5900. Report of the Secretary of State 559 (1902).

The disfranchising character of the complicated application form was also of great importance. This form has a number of traps for the unwary. One requirement is that the applicant state his age in years, months, and days. "It was estimated that not more than ten per cent of negroes of voting age would be able to satisfactorily pass this test." Evans, 56. See Kernan, 57–60.

49. Persons who qualified under this section before September 1, 1898, when it expired, were: 37,877 whites and 111 Negroes. Report of the Secretary of State 558 (1902). Later, registration under the grandfather clause was extended to September 1, 1913. Act 24 of 1912.

50. "One fourth of the white voters had been disfranchised or discouraged from registering. Almost 40,000 less white people had registered in 1900 than in 1897." Howard, 103.

mince his words: "We have here no political antagonism and I am called upon to preside over what is little more than a family meeting of the Democratic Party of the State of Louisiana. * * * We are all aware that this Convention has been called * * * principally to deal with one question * * * to eliminate from the electorate the mass of corrupt and illiterate voters who have during the last quarter century degraded our politics."[51] The Convention voted that no ordinance should be considered until the report of the Committee on Suffrage and Election was finally acted upon by the Convention. Near the end of the Convention, President Kruttchnitt announced:

"We have not been free; we have not drafted the exact Constitution we should like to have drafted; otherwise we should have inscribed in it, if I know the popular sentiment of the State, Universal White Manhood Suffrage, and the exclusion from the suffrage of every man with a trade of African blood in his veins. * * * What care I whether it be more or less ridiculous or not? Doesn't it meet the case? Doesn't it let the white man vote, and doesn't it stop the negro from voting, and isn't that what we came here for?"[52]

In his message to the legislature, Governor Foster was able to say:

"The white supremacy for which we have so long struggled at the cost of so much precious blood and treasure, is now crystallized into the Constitu-

tion as a fundamental part and parcel of that organic instrument, and that, too, by no subterfuge or other evasions. With this great principle thus firmly imbedded in the Constitution, and honestly enforced, there need be no longer any fear as to the honesty and purity of our future elections."[53]

Following the example of Mississippi, with respect to its 1890 Constitution, Louisiana did not submit the 1898 Constitution to the vote of the people.[54]

To make the disfranchisement effective, the legislature directed a complete new registration of all voters. Registration rolls before and after adoption of the Constitution show the prompt effect the grandfather clause had on Negro voters.

| | January 1, 1897 | March 17, 1900 |
|---|---|---|
| Number of Negro Voters | 130,344 | 5,320 |
| Number of White Voters | 164,088 | 125,437 |

The drop in Negro registration continued, so that by 1910 only 730 or less than 0.5 per cent of the adult male Negroes were registered. In the sixty parishes then in existence, there were no Negroes registered in twenty-seven parishes and only one Negro registered in each of another nine parishes. Only ten parishes had more than ten Negro registered voters each. By 1918, when there were sixty-four parishes, thirty-seven parishes had no Negroes registered. Eight other parishes had only a single Negro on the voter registration rolls.[55] "With the adoption of the Constitution of 1898, Louisiana became in fact and

51. Journal of the Constitutional Convention, 9.

52. Journal of the Constitutional Convention, 380.

53. La. Senate Journ. 1898, 33–35.

54. The Constitution of 1898 was called under an act of the Legislature which was voted upon by the people, who, in so voting, agreed that the Convention might declare the Constitution adopted without referring it back again to the people. "This act * * * is a curiosity among the acts calling constitution-

al conventions." Eaton, The Suffrage Clause in the New Constitution of Louisiana, 13 Harv.L.Rev. 279 (1899). The "only constitutions wholly submitted to the people in a proper election were those in 1845 and 1852." Hart, The Quar. Constitutions of Louisiana, 3 La. Hist. 750, 782 (1921). The Constitution of 1879 was submitted to the people for ratification or rejection.

55. These figures and most of the others used in this opinion are taken from Reports of the Secretary of State, compiled

practice a white man's state as far as its politics went." [56]

The 1913 Constitution did not change the suffrage provisions of the 1898 Constitution.

In 1915, in *Guinn v. United States*, the Supreme Court declared the Oklahoma grandfather clause unconstitutional. Chief Justice Edward Douglass White, of Louisiana, who fought with "Louisiana's Own" at the Battle of Liberty Place [57] and was the campaign manager for Governor Nicholls in 1888, wrote the opinion.

Against this background, a constitutional convention was called in 1921. Although there were several good reasons for Louisiana to revise its constitution, it was well understood, as reported in the New Orleans Times-Picayune: "Revision of the suffrage provision [was] necessary because the United States Supreme Court [had] declared the famous 'grandfather clause' invalid. \* \* \* Already several substitutes have been proposed, among them the 'understanding clause' from Mississippi \* \* \* and the plan of Ex-Governor R. G. Pleasant to confine the right of suffrage to those who inhabited the earth North of the twentieth degree of North latitude prior to October 12, 1492, when Columbus discovered America. The purpose of his plan is to shut out the Negro." [58]

We are handicapped in studying the legislative history of the Constitution of 1921 because, at the request of Ruffin G. Pleasant, the former Governor, who was Chairman of the Committee on Suffrage and Elections, the Committee met in secrecy and no minutes were kept of any discussion or debate. The newspaper accounts of the proceedings, the next best evidence,[59] quote Gov-

---

as "Statements of Registered Voters in the State of Louisiana".

The voters qualified to register in 1900 were as follows:

| | White | Negro |
|---|---|---|
| Under the "educational" qualification | 86,157 | 4,327 |
| Under the "property" qualification | 10,793 | 916 |
| Under the "grandfather" clause | 29,189 | 0 |

There should be a mental adjustment for all comparative registration figures in Louisiana to take into account the downward trend of the Negro population in the State. For example, in 1900 Negroes made up about 50 per cent of the population. Today, they make up about 30 per cent of the population of Louisiana.

56. 1 Chambers, 699.

57. Landry, 130, 233.

58. Times-Picayune, February 27, 1921. As early as 1916, in a comment in the first issue of the Southern Law Quarterly, now the Tulane Law Review, M. B. Redman discussed the interpretation test (Mississippi's understanding clause) as a constitutional equivalent of the Louisiana grandfather clause. 1 Sou.L.Quart. 46, 47–48 (1916).

59. "Historical facts of general and public notoriety may indeed be proved by reputation, and that reputation may be established by historical words of known character and accuracy." Morris v. Harmer's Heirs' Lessee, 1833, 7 Pet. 553, 558, 8 L.Ed. 781. (J. Story)

The United States introduced a large number of certified copies of newspaper articles of the period. The newspaper articles are admissible to show purpose. They are the only contemporaneous reports of the 1921 convention available, except for a few legal writings, because of the Convention's decision to hold secret, unreported meetings and discussions on suffrage. In Hall v. St. Helena Parish School Board, E.D.La.1961, 197 F.Supp. 649, aff'd 1961, 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521, this Court turned to newspaper accounts in support of its finding of a racially discriminatory purpose in the *adoption of a local option school closing law.* In that case we noted: "The sponsors of this legislation, in their public statements, if not in the Act itself, have spelled out its real purpose" (197 F.Supp. 652). In an accompanying footnote, we said: "In Louisiana, as in most states, the legislative debates, committee proceedings, and committee reports are not recorded officially. Going to the next best records, newspapers, we find in the record of this case a mass of contemporary newspaper articles, filed by the plaintiffs and by amicus curiae, bearing on the legislative history of Act 2 and its related measures. Affidavits from the authors of the articles attest their accuracy. In all instances they are part of the official records. Their reliability is evidenced by their sub-

ernor Pleasant as saying that this was because "there might be one subject coming up for discussion which we would not care to have preserved. * * *" [60] Suffrage was "a delicate question" and the members preferred "not to debate it in the open." [61] No one failed to hear and heed the thunder of the silence.

The Committee first considered and rejected Governor Pleasant's "Christopher Columbus" proposal. [62] The plan finally agreed upon was the plan rejected in 1898 because of its "immorality"—Mississippi's understanding clause, the interpretation test. In reporting the proposal, newspapers of the period consistently referred to it as the Mississippi "understanding" clause, quoting Mr. C. E. Hardin of Vernon Parish and Judge Phillip S. Pugh of Arcadia Parish, [63] and described it as a "substitute" or "replacement" for the illegal grandfather clause. [64] For example, a news report of the Times-Picayune characterized the plan as, "An ordinance designed to plug the hole shot through the suffrage provision when the United States Supreme Court declared the famous 'grandfather' clause invalid". The Negro community had no trouble recognizing the purpose of the test. A large delegation of Negro leaders from New Orleans, Baton Rouge, Shreveport, and the parishes appeared before the committee to plead in vain for the franchise, and for more educational facilities. [65] "The Convention [also] placed the power to remove any registrar in the State in the hands of an *ex officio* board of registration composed of the governor, lieutenant governor, and speaker, a majority of whom were more likely to be white men. Should any registrar show a tendency to administer the new registration tests too liberally, or otherwise to conduct his office in a manner displeasing to the administration, the state board could remove him at will." [66]

When the Committee on Suffrage and Elections finally agreed on the interpretation test, the Baton Rouge Times accurately reported:

"The grandfather clause is eliminated and there is substituted an understanding and good character clause. * * *" [67]

As Professor Powell said in his study of Louisiana constitutions for the Louisiana Law Institute, "In justice to the Convention, it must be said that even its bitterest critics could not deny that the Negroes were almost completely disfranchised." [68]

stantial agreement." See Dallas County v. Commercial Union Assurance Co., 5 Cir. 1961, 286 F.2d 388, involving private litigation. See also Davis v. Schnell, S.D. Ala.1949, 81 F.Supp. 872, aff'd 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093. Cf. Grosjean v. American Press Co., 1936, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660.

60. New Orleans Times-Picayune, April 3, 1921, p. 1; New Orleans States, March 3, 1921, p. 2.

61. New Orleans Times-Picayune, March 27, 1921, p. 10.

62. New Orleans Times-Picayune, February 27, 1921, p. 8; Looney, Suffrage in the Louisiana Constitution of 1921, 6 Loyola L.Jour. 75, 87 (1925).

63. Times-Picayune, March 14, 1921. The Times-Picayune of March 22, 1921 reported that Judge Pugh "holds that these requirements or qualifications are judicially bombproof."

64. Baton Rouge State Times, May 9, 1921, p. 7; New Orleans Times-Picayune, March 14, 27, 1921, p. 1; Looney, 79. "With regard to suffrage, the principal feature * * * was the addition of the 'reasonable interpretation' and 'understanding' provision of the Mississippi Constitution". Evans, 68.

65. New Orleans States, March 31, 1921, p. 6. As in 1898, when Booker T. Washington pleaded unsuccessfully for the Convention not to disfranchise the Negroes, Bishop R. E. Jones, Dr. J. S. Clark, President of Southern University, John G. Lewis, B. V. Baranco, and Walter L. Cohen had no quarrel with an objective educational requirement.

66. Powell, 485.

67. The (Baton Rouge) State Times, May 9, 1921, p. 7, col. 1. See also New Orleans Times-Picayune, March 27, 1921, p. 1, col. 1.

68. Powell, 443.

**B.** As an historical fact, and as appears from the evidence, the interpretation test was rarely, if ever, applied until the early fifties. It was not needed. The Democratic white primary made registration futile for Negroes.[69] The Democratic State Central Committee, acting under authority granted to it by the State, restricted all candidates and voters in the Democratic Party primary elections for state officers to white persons.[70] "[D]ebarment from the nominating process is in effect disfranchisement. Denial of the privilege of participating in primaries also means, essentially, ineligibility to party membership in general and excludes the negro from all party proceedings such as mass meetings, conventions, or caucuses of voters in the precinct and from delegate conventions in larger areas, to say nothing of party offices and candidacies in the party primaries." Weeks, The White Primary, 8 Miss.L.J. 135, 136 (1935).

The white primary not only effectively kept Negroes from voting in the only election that had any significance in the Louisiana electoral process but it also correspondingly depressed Negro registration to insignificantly low numbers. During the period from 1921 to 1946 Negro registration was never in excess of one per cent of the total registered voters, although the Negro population of the state then constituted about one-third of the potential voters. In 1942 only 957 Negroes were registered to vote in Louisiana and no Negroes were registered in fifty-one of the sixty-four parishes of Louisiana.

In 1944, white primaries, even those conducted by a political party and not by the State, were declared unconstitutional. Smith v. Allwright, 1944, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987.[71] After the demise of the white primary, Negro registration in Louisiana rapidly increased, rising from 1,029 in 1944 to 7,561 in 1946, to 22,576 in 1948, and to 120,000 in 1952.[72] In 1956 there were 161,410 Negro voters, 15 per cent of the total registered vote in Louisiana, the highest percentage of Negro voters in any state in the southeastern region of the country.

The decline and fall of the white primary, the return of Negro soldiers from World War II, the intensified tempo of activity in Negro organizations after the School Segregation Cases in 1954, and the civil rights explosion all worked toward increasing Negro interest in voting. These and correlative factors made

**69.** "Until its nullification by the Supreme Court in 1944, the white primary was a more important component of the system than formal limitations on the right to vote. Negroes were excluded as Negroes from the party primary; they could be legally excluded from the general election only by indirection. Invalidation of the white primary, therefore, brought again into prominence the literacy test and other methods of disfranchisement by indirection." Key, Southern Politics, 555 (1949).

See also Weeks, The White Primary, 8 Miss.L.J. 135 (1935); Weeks, The White Primary: 1944–48, 42 Am.Pol. Sc. R. 500 (1948); Harris, The Quest for Equality 119–125 (1960); Moon, The Negro Vote in the Presidential Election of 1956, 26 Jour. Negro Education 219 (1957); Lubell, The Future of the Negro Voter in the United States, 26 Jour. Negro Education 408 (1957); Nabrit, The Future of the Negro Voter in the South, 26 Jour. Negro Education 418

(1957); Sindler, Huey Long's Louisiana 34 (1956); Ewing, Primary Elections in the South 4 (1957); Note, Negro Disfranchisement, 47 Col.L.Rev. 76, 77 (1947).

**70.** Minutes of the Democratic State Central Committee, various meetings, Oct. 6, 1931 to Oct. 7, 1947.

**71.** See also Nixon v. Herndon, 1924, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759; United States v. Classic, 1941, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368; Terry v. Adams, 1953, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152; Elmore v. Rice, E.D. S.C.1947, 72 F.Supp. 516, aff'd 4 Cir. 1947, 165 F.2d 387, cert. den'd, 333 U.S. 875, 68 S.Ct. 905, 92 L.Ed. 1151.

**72.** The number of white voters increased from 711,289 in 1944 to 762,560 in 1946 to 885,437 in 1948. Again, these are from the Secretary of State Reports, Statements of Registered Voters in the State of Louisiana. See also Price, The Negro Voter in the South 1 (1957).

it imperative for parish registrars in Louisiana to utilize the interpretation test, if the State intended to maintain its policy of segregation, historically indissolubly bound with disfranchisement of Negroes.

C. Immediately following the School Segregation Cases, two strong organizations dedicated to maintaining segregation in Louisiana were established, one by the legislature and one by private persons with official blessing. These two organizations have an important place in the history of the interpretation test. In our study, we see these organizations crossing and recrossing, publicizing and promoting the purpose and function of the test and how best to use it in order to prevent Negro participation in the electoral process. First, in 1954, the Louisiana legislature created a Joint Legislative Committee "to provide ways and means whereby our existing social order shall be preserved and our institutions and ways of life * * * maintained." This was to be accomplished by a program "to maintain segregation of the races in all phases of our life in accordance with the customs, traditions, and laws of our State." [73] This Committee became known as the "Segregation Committee". Its chairman was William M. Rainach, State Senator from Claiborne Parish where there are more Negroes than white persons.[74] Its counsel was William M. Shaw, also from Claiborne Parish. Second, at about the same time or before, Senator Rainach and Mr. Shaw and others organized and incorporated the Association of Citizens Councils of Louisiana to "protect and preserve by all legal means, our historical Southern Social Institutions in all of their aspects." [75] Senator Rainach was the first president of the Citizens Councils. Mr. Shaw was its first secretary. Senator Rainach and Mr. Shaw organized local councils and spearheaded the operations of the Segregation Committee.

In 1956, the Association of Citizens' Councils published a pamphlet, prepared by Mr. Shaw and Senator Rainach, entitled, "Voter Qualification Laws in Louisiana—The Key to Victory in the Segregation Struggle." The pamphlet advocated a two-step program. First, the registration rolls should be purged of "the great numbers of unqualified voters who have been illegally registered", and who "invariably vote in blocks and constitute a menace to the community." Second, registrars should strictly enforce the interpretation test. The pamphlet concludes, "The whole purpose of our registration laws is to prevent the registration of ignorant, 'bloc' voters * * * " The foreword of the pamphlet makes clear who is referred to by the term "bloc" voter:

"The Communists and the NAACP plan to register and vote every colored person of age in the South * * *. They are not concerned with whether or not the colored bloc is registered in accordance with law."

No stress, no strain:

"If our laws are intelligently and fairly administered, they will accomplish our purpose automatically."

The "Key to Victory" is subtitled, "A Manual of Procedure for Registrars of Voters, Police Jurors and Citizens Councils." The booklet was the principal topic of discussion at State-sponsored meetings on voter registration attended by registrars and other public officials and was distributed to all persons attending such meetings. The State of Louisiana distributed it to parish registrars, with instructions to follow closely its purpose and intent. Senator Rainach and Mr. Shaw in their dual role as legislative and Citizens' Council leaders were clothed with State authority as they traveled about the State urging and even demand-

---

73. La. Legislature, House Concurrent Resolution No. 27 (1954).

74. The Report of the State Board of Registration for the month ending December 31, 1962, shows that 5,216 white persons and 34 Negroes are registered to vote in Claiborne Parish.

75. Article II, Act of Incorporation.

ing that the registrars adopt their program.

Carrying out the first phase of the program, local Citizens Councils and their members conducted extensive purges, principally in 1956–58 in eight parishes throughout the state,[76] under the provisions of the challenge statute, Louisiana R.S. 18:133 (1950) LSA. The evidence shows that primarily Negroes were removed from the rolls, although a few whites were also purged in a token effort to maintain an air of nondiscriminatory treatment. Most registrars cooperated fully with Citizens Council members in conducting the purges when requested to do so. Innumerable white persons whose registration cards showed deficiencies similar to those of the Negroes were not purged. One registrar said in her deposition that in her parish the Citizen Council members conducting the purges corrected the errors they made on their own registration applications, while at the same time challenging Negroes for similar mistakes. Many purges were for failure to take the interpretation test, even though that test had not been administered at the time of the registrant's application. When contested in federal court, these purges were found to be illegal deprivations of the Negroes' constitutional rights. United States v. McElveen, 1960, E.D.La., 180 F. Supp. 10, modified sub nom. United States v. Thomas, 1960, 362 U.S. 58, 80 S.Ct. 612, 4 L.Ed.2d 535; United States v. Association of Citizens Councils of Louisiana, et al., 1961, W.D.La., 196 F. Supp. 908; United States v. Wilder, 1963, W.D.La., 222 F.Supp. 749.

In late 1958 and early 1959 the Segregation Committee and the State Board of Registration jointly sponsored meetings in each congressional district. Registrars were required to attend; sheriffs, police jurors, and other parochial officials, and officers of citizens councils also attended the meetings. At these meetings the Citizens Council's "Key to Victory" was officially distributed to the registrars. Senator Rainach, at that time still Chairman of the Segregation Committee and President of the Association of Citizens Council, was the chairman at these meetings. Mr. Shaw, at that time was still counsel for the Segregation Committee and still counsel for the Association. They led these meetings, vigorously emphasizing the importance of maintaining segregation.

Senator Rainach would tell the registrars, "The fight for school integration in the South has shifted * * * to a fight for the voters of the Negro masses * * *" He pointed out to the registrars that during the Reconstruction Period, when Negroes were permitted to vote, the public schools of Louisiana were integrated, and that, with the Negroes representing 32

76. Beginning April 15, 1956, the Citizens Council of Ouachita Parish challenged all 5,782 of the registered Negroes. Of these, all but 595 were stricken from the rolls. The Attorney General of Louisiana sent Mr. Shaw as a special representative to advise the Registrar of voters of Ouachita Parish. As of December 1962, Negro registration in Ouachita was up to 1,038. In Bienville Parish permanent registration was adopted after the purge. All persons who had registered since January 1, 1953, were put on the permanent rolls, except those who were purged. For the Negroes, nearly all of whom were purged, the interpretation test was a prerequisite to registration while for whites, nearly all of whom had registered before it, was not a prerequisite. Thus, as of October 1, 1955, there were 4,825 white persons registered to vote in Bien-

ville Parish out of a white voting population which, according to the 1960 census, was 5,617.

Some parishes required no special effort. For example, in East Carroll, Madison, Tensas, and West Feliciana, there were no registered Negroes and in Claiborne there were only a few on the rolls. In parishes such as Webster, Morehouse, Franklin, and West Carroll, where there was periodic registration, there was no need for a purge because the rolls were automatically cleared. Negro registration in Webster dropped from 1,776 to 83 in 1958. However, there were purges even in some parishes which had periodic registration, such as Lincoln, Red River, and Richland Parishes. Negro registration in Red River dropped from 1,360 to 16 in 1958.

per cent of the population of the state, the Negroes could easily do again what they did during the Reconstruction Era, if they should become registered to vote.

According to Senator Rainach, "In 1897, our forefathers in Louisiana started a program of voter qualification law enforcement, knowing that such a program would provide the solution to their problems." The present voter qualification laws "are adequate to solve our present problems * * *" Senator Rainach stressed that "registrars have become critically important officials * * * they have become the focal point of the solution to our problems."

Mr. Shaw would explain the registrar's part. The *"key to the solution of our whole problem lies in the interpretation of the Constitution," Mr. Shaw told the registrars.* He urged the registrars to require applicants to interpret the constitution and provided them with 25 test cards to be used for this purpose. Mr. Shaw instructed the registrars:

"[T]he constitutional test and their ability to understand the duties and responsibilities under a republican form of government, which is another one of the tests, is basically a test of a person's understanding, which is native intelligence in that you can educate a fool, but you'd still have nothing but an educated fool when you get through, and he wouldn't be able to qualify. And therefore, *if they were correctly and fairly administered*—that's the key to the whole thing—directed fairly—then it will amount to a test of ability, of a person's understanding, which is native ability. It is not education. Education can merely refine native understanding. If you have no native understanding to start out with, it can't be refined." (Emphasis added.)

Mr. Shaw also told the registrars:

"Constitutional tests are a test of native intelligence and not 'book learning'. Experience teaches that most of our own white people have this native intelligence while most Negroes do not."

Mrs. Mary C. Flournoy, former Registrar of Winn Parish, gives us some indication of the meaning of "correctly and fairly administer[ing]" the test. She stated that Senator Rainach, while he was Chairman of the Segregation Committee, told her to discriminate on account of race in processing applications:

"Rainach told me if * * * I can't fail them [Negro applicants] any other way, I could pull those Constitution reading cards on them.

"* * * * Rainach wanted me to pull those hard cards on colored people."

D. The Louisiana *Codes Noir* of Colonial times and the Black Codes of the eighteen sixties; the pre-Civil War denial of the vote to Negroes, even to wealthy and educated free men of color; the ebb and flow of Negro rights in the Constitutions of 1864 and 1868; the 1879 transfer of political power from police juries and the legislature to the Governor; the close election of 1892 and the 1896 victory for white supremacy; the grandfather clause and the complicated registration application form in the Constitution of 1898; the invalidity of the grandfather clause and the consequent resort to Mississippi's understanding and interpretation clause; the effectiveness of the white primary as a means of disfranchising Negroes; the invalidity of the white primary and the consequent need to revive enforcement of the interpretation test; the White League and the Citizens' Councils; the Black League and the N.A.A.C.P.; the Battle of Liberty Place in 1874 and the Ouachita voting purge of 1956—these are all related members of a series, all reactions to the same dynamics that produced the interpretation test and speak eloquently of its purpose.

■ In sum, the interpretation test is another grandfather clause. Its purpose is rooted in the same history. It has the same objective the delegates to the Constitutional Convention of 1898 envisaged for the grandfather clause. It

is capable of producing the same effective disfranchisement of Negroes today that the grandfather clause produced sixty-five years ago.

## V.

■ Having determined the true reason for the interpretation test in its historical setting, we turn from *why* to *how* the test is used as a discriminatory device.

There are two reasons for a court to consider how a law is administered. The obvious reason is that any regulatory statute may be administered unfairly. If so, the court may enjoin the unfair acts without passing on the validity of the statute. But there is another reason. Just how a law is actually used by those charged with administering it is a proper guide to the purpose of the law and its necessary effect. Here, we find massive evidence that the registrars discriminated against Negroes not as isolated or accidental or unpredictable acts of unfairness by particular individuals, but as a matter of state policy in a pattern based on the regular, consistent, predictable unequal application of the test. This is the inescapable effect of a subjective requirement such as an understanding or interpretation test barren of standards and safeguards, the administration of which rests in the uncontrolled discretion of a registrar.

The United States introduced a great mass of evidence in the record, but with commendable diligence made it digestible by well-prepared indices and well-organized summaries. The evidence of discriminatory application of the interpretation test is especially well documented and supported by testimony with respect

to the following parishes: Plaquemines, East Feliciana, Webster, Bienville, Red River, Jackson, and Ouachita.

A. First of all, a Louisiana registrar has the power to use or not to use the interpretation test. The parties to this case stipulated that the test had never been used in the four largest parishes of the state, Caddo, Jefferson, East Baton Rouge, and Orleans. These parishes have almost forty per cent of the total number of registered voters in the State. The United States introduced evidence that the interpretation test was used in twenty-one parishes.[77] No mention was made of the other thirty-nine parishes in the state. The evidence shows that the test was seldom, if ever, applied anywhere in Louisiana before 1954 [78] because, as previously pointed out, until the white primary was invalidated there was no need for the test. This means that the *majority of Louisiana voters now registered under the permanent registration law have never taken the test.*

In the twenty-one parishes where it has been shown that the interpretation test has been used, as of December 31, 1962, only 8.6 per cent of the adult Negroes were registered as against 66.1 per cent of the adult white persons registered. Before the interpretation test was put into use, a total of 25,361 Negroes were registered in the twenty-one parishes using the test. By August 31, 1962, total Negro registration in these parishes was 10,351. During the same period, white registration was not discernibly affected.

B. The decision to enforce the interpretation test more than thirty years after its adoption was accompanied, in almost every parish where the test has

---

77. These parishes are: Bienville, Claiborne, DeSoto, East Carroll, East Feliciana, Franklin, Jackson, LaSalle, Lincoln, Morehouse, Ouachita, Plaquemines, Rapides, Red River, Richland, St. Helena, Union, Webster, West Carroll, West Feliciana, and Winn. The Director of the State Board of Registration testified that certain other parishes use the test but he had no personal knowledge of this. He said also that Caddo Parish uses the

test; the parties however have agreed that Caddo does not use it.

78. The depositions were taken of twenty registrars and former registrars who used the interpretation test. The earliest use of the test by any of these registrars was in November 1955. The former registrar of Plaquemines Parish testified that he started using the test late in 1954.

been used, by a wholesale purge of Negro voters or by periodic registration so that Negro voters were required to re-register *after* the test came into use. Citizens Council members challenged the registration of large numbers of Negro voters on the ground that they had not satisfied all of the requirements of the Louisiana voter qualification laws at the time they registered. Actually, the challenged Negroes had satisfied all the requirements imposed by the registrar *at the time* they registered. White voters had registered under the same standards and procedures as the Negroes and their registrations suffered from the same alleged deficiencies as the Negroes who were purged. In at least two parishes, Ouachita and East Feliciana, one ground for challenging Negroes was that they had not interpreted or were not able to interpret a constitutional section, even though the test had not been used in either parish before the purge.

In most parishes where there was a purge, since the Negroes were unable to gain reinstatement in the manner prescribed by Louisiana law, they were required to re-register. And to do so they had to pass the interpretation test. The white voters, not having been challenged, in effect were exempted from the test. The discrimination brought about by the purge and the use of the interpretation test was frozen into the system in parishes such as Bienville, DeSoto, Jackson, Ouachita and Rapides, which have permanent registration. In parishes using periodic registration the purges had a deterrent effect on Negro registration which is still felt.[79]

C. The registrar's whim alone determines which applicants will be tested. The Constitution merely states that applicants "shall *be able to* understand and give a reasonable interpretation" of a section of a constitution. Some registrars, for example, those in LaSalle, Lincoln, and Webster parishes, have interpreted this to mean that the applicant need not actually interpret the constitution, only that he have the ability to do so. The State Board of Registration maintained at one time that the correct interpretation was that the applicant must demonstrate his ability in all cases. It has, however, changed its understanding or interpretation of this very section of the Constitution. After the institution of this suit, the Board prescribed another test, instructing registrars to cease requiring an interpretation. The change in the interpretation given the interpretation-test provision of the Constitution by the State agency charged with enforcing it and the wide variety of interpretations adopted by the registrars reaffirm the impossibility of achieving objective standards for an interpretation of the Constitution acceptable to the State. Pity the applicant asked to interpret the interpretation test!

D. The Louisiana Constitution contains 443 sections, as against 56 sections in the United States Constitution, and is the longest and the most detailed of all state constitutions. The printed copy published by the State, unannotated, contains 600 pages, not counting an index of 140 pages. The evidence clearly demonstrates great abuses in the selection of sections of the constitutions to be interpreted. Some registrars have favorite sections which they apparently use regardless of an applicant's race. Some open a volume containing the United States and Louisiana Constitutions and, like soothsayers seeking divine help from the random flight of birds, require an applicant to interpret the section on the page where the book opens. The Segregation Committee distributed to registrars sets of twenty-four cards, each containing three sections of the Constitution with instructions that they be used in administering the interpretation test. The Registrar of Ouachita Parish used a set of test cards containing sections chosen by the Citizens' Council. The Registrar of Plaquemines used cards and an-

79. Thus, in Red River Parish very few Negroes have applied since 1956, although there were 1,362 Negroes registered be-fore the purge. As of December 31, 1962, there were 31 Negroes registered.

swers prepared by Mr. Leander Perez, District Attorney for the Parish.

It is evident from the record that frequently the choice of difficult sections has made it impossible for many Negro applicants to pass. White applicants were more often given easy sections, many of which could be answered by short, stock phrases such as "freedom of speech", "freedom of religion", "States' rights", and so on. Negro applicants, on the other hand, were given parts of the Louisiana Constitution such as Article VII, § 41; Article X, § 1, § 16; Article XIV, § 23, § 24.2.[30]

E. As in the selection process, gross abuses of discretion appear in the evaluation of the interpretations. One rejected Negro applicant stated that the registrar "said what I was saying was right, but it wasn't like she wanted me to say it".

Most of the interpretation tests have been administered orally, thus precluding the use of written records as a check on what the registrar accepted as reasonable interpretations. Nevertheless, the record shows that interpretations far less responsive to the constitutional text selected have been accepted from whites than from Negroes. Compounding this with the fact that Negroes were often given more difficult sections to interpret, the bias in favor of the whites becomes readily apparent.

Some parishes administered written examinations and kept records of the questions asked and the responses accepted. In these examinations the registrar usually employed one or more of several sets of cards containing selected sections of the Constitution and a space for the applicant's interpretation of it. Even the most cursory glance at the records in these parishes underscores the heavy burden under which Negro applicants were laboring. In one set of cards, there is great disparity in the difficulty of the questions asked. This enables the registrar to select cards with simple sections for white applicants and difficult cards for Negroes. There is unmistakable evidence that many white applicants were shown cards with sample answers on them. Some applicants admitted this, and there is even an instance of a white

80. Article 7 reads: "All cases in which the punishment may not be at hard labor shall, until otherwise provided by law, be tried by the judge without a jury. Cases, in which the punishment may be at hard labor, shall be tried by a jury of five, all of whom must concur to render a verdict; cases, in which the punishment is necessarily at hard labor, by a jury of twelve, nine of whom must concur to render a verdict; cases in which the punishment may be capital, by a jury of twelve, all of whom must concur to render a verdict." Article 10 reads: "The power of taxation shall be vested in the Legislature; shall never be surrendered, suspended or contracted away; and all taxes shall be uniform upon the same class of subjects throughout the territorial limits of the authority levying the tax, and shall be levied and collected for public purposes only. No property shall be assessed for more than its actual cash value, ascertained as directed by law, and all tax-payers shall have the right of testing the correctness of their assessments before the courts at the domicile of the assessing authority, or as may be directed by law. The valuation and classification fixed for State purposes shall be the valuation and classification for local purposes; but the taxing authorities of the local subdivision may adopt a different percentage of such valuation for purposes of local taxation." Article 14 reads: "The City of New Orleans by a vote of three-fourths of all members of the Sewerage and Water Board of New Orleans, approved by a vote of three-fourths of all the members of the Board of Liquidation, City Debt, and approved by resolution of the Commission Council, or its successor as the governing body of said municipality, adopted by a vote of two-thirds of all the members of said Council, or governing body, shall have power and is hereby authorized to issue bonds to the amount of Nine Million Dollars ($9,000,000) of said City to be styled 'City of New Orleans, Sewerage, Water and Drainage Serial Gold Bonds', and to bear such rate of interest as the Board of Liquidation, City Debt, may fix from time to time as said bonds are offered for sale, as hereinafter provided, for the purpose of constructing and extending the sewerage, water and drainage system of said City."

applicant having, by mistake, signed the sample answer card. Negroes were not allowed to see the acceptable answers, let alone copy them. Similarly, the pattern of the answers indicates that the registrars often told white applicants the currently acceptable answers. The phraseology of almost every answer in one parish changed right along with the registrar's change in the wording of the acceptable answer.

Registrars were easily satisfied with answers from white voters. In one instance "FRDUM FOOF SPETGH" was an acceptable response to the request to interpret Article 1, § 3 of the Louisiana Constitution.

On the other hand, the record shows that Negroes whose application forms and answers indicate that they are highly qualified by literacy standards and have a high degree of intelligence have been turned down although they had given a reasonable interpretation of fairly technical clauses of the constitution. For example the Louisiana Constitution, Article X, § 16 provides: "Rolling stock operated in this State, the owners of which have no domicile therein, shall be assessed by the Louisiana Tax Commission, and shall be taxed for State purposes only, at a rate not to exceed forty mills on the dollar assessed value." The rejected interpretation was: "My understanding is that it means if the owner of which does not have residence within the State, his rolling stock shall be taxed not to exceed forty mills on the dollar."

In another instance the registrar rejected the following interpretation of the Search and Seizure provision of the Fourth Amendment: "[N]obody can just go into a person's house and take their belongings without a warrant from the law, and it had to specify in this warrant what they were to search and seize." Another rejected interpretation of the same Amendment by a Negro applicant was: "To search you would have to get an authorized authority to read a warrant." The Louisiana Constitution Article I, § 5 provides: "The people have the right peaceably to assemble." A registrar rejected the following interpretation: "That one may assemble or belong to any group, club, or organization he chooses as long as it is within the law."

Each of these incidents *could* conceivably be an isolated event, indicating personal dereliction by one registrar, regrettable, but basically trivial in the general administration of the interpretation test. However, the great number of these and other examples, illustrative of a conscious decision, show conclusively that the discriminatory acts were not isolated or accidental or peculiar to the individual registrar but were part of a pervasive pattern and practice of disfranchisement by discriminatory use of the interpretation test.

The State does not deny that unlimited discretion is vested in the registrars by the laws of Louisiana, but argues that officials must act reasonably and that their decisions are subject to review by district courts. Louisiana, however, provides no effective method whereby arbitrary and capricious action by registrars of voters may be prevented or redressed. Unreviewable discretion was built into the test.

The State Board of Registration recently recognized the arbitrary nature of the test, and, as indicated earlier in this opinion, abandoned its general use after the institution of this suit. However, the Constitution and statutes of Louisiana still require the use of the understanding and interpretation test. And registrars have not entirely abandoned it, despite the institution of the new test. For example, as late as April 1963 the Webster registrar was using the interpretation test because, as she explained, "it's still on the books"; sometimes she gave the citizenship test and sometimes the interpretation test. Voters registering now could be challenged and purged in the future for not taking the interpretation test—should history repeat itself. This is exactly what happened in the middle and late nineteen-fifties.

F. The statistics demonstrate strikingly the effect of resurrection of the interpretation test. A report of the Louisiana Sovereignty Committee, December 14, 1960, boasts:

"We would like to call your attention to the fact that, during this four year period of time, from 1956 until 1960, 81,214 colored people became of voting age, when the registration figures of colored people actually declined 2,377. Going further during this four year period, we had 114,529 white people who became of voting age and, during this four year period of time, the white registration increased 96,620."

The State of Louisiana accomplished its purpose in the parishes where the constitutional interpretation test was used.[81] In those twenty-one parishes, registration of white persons between 1956 and December 31, 1960, increased from 161,069 to 162,427; registration of Negroes decreased from 25,361 to 10,256.

## VI.

We have considered the true reason for the test, how the test was in fact used to accomplish its purpose, and its necessary effect. Now, we apply the law.

 No one doubts the broad scope of the State's power to fix reasonable, nondiscriminatory qualifications for voting consistent with the Constitution. Thus, a literacy test bears a reasonable relation to a governmental objective and, if it does not perpetuate past discrimination, is a permissible requirement. "[I]n our society * * * a State might conclude that only those who are literate should exercise the franchise." Lassiter v. Northampton County Bd. of Elections, 1959, 360 U.S. 45, 52, 79 S.Ct. 985, 990, 3 L.Ed.2d 1072. Since Louisiana has the highest illiteracy rate in the nation, the State has even more reason than most states to use a literacy test as a spur to improve the level of the electorate. But the understanding clause, which is an interpretation test of the constitutions,

[81]

### DISCRIMINATORY EFFECT OF THE INTERPRETATION TEST

| PARISH | Voting Age Population (1960) | | Registered Voters March 17, 1956 | | Registered Voters Dec. 31, 1960 | |
|---|---|---|---|---|---|---|
| | White | Negro | White | Negro | White | Negro |
| Bienville | 5,617 | 4,077 | 5,328 | 587 | 5,175 | 25 |
| Claiborne | 6,415 | 5,032 | 5,808 | 17 | 5,501 | 29 |
| DeSoto | 6,543 | 6,753 | 5,640 | 762 | 5,822 | 594 |
| East Carroll | 2,990 | 4,183 | 3,000 | 0 | 2,845 | 0 |
| East Feliciana | 4,200 | 4,102 | 2,812 | 1,361 | 2,448 | 82 |
| Franklin | 8,954 | 4,433 | 8,297 | 650 | 8,260 | 390 |
| Jackson | 6,607 | 2,535 | 5,457 | 1,113 | 5,804 | 483 |
| LaSalle | 6,799 | 849 | 6,861 | 742 | 6,823 | 220 |
| Lincoln | 9,611 | 5,723 | 7,029 | 1,166 | 6,928 | 860 |
| Morehouse | 10,311 | 7,208 | 9,400 | 935 | 7,489 | 301 |
| Ouachita | 40,185 | 16,377 | 24,184 | 5,782 | 24,789 | 729 |
| Plaquemines | 8,633 | 2,897 | 4,741 | 49 | 7,160 | 47 |
| Rapides | 44,823 | 18,141 | 26,293 | 3,160 | 30,362 | 3,073 |
| Red River | 3,294 | 2,181 | 3,575 | 1,512 | 3,429 | 27 |
| Richland | 7,601 | 4,608 | 7,195 | 740 | 6,075 | 263 |
| St. Helena | 2,363 | 2,082 | 2,555 | 1,694 | 2,478 | 1,243 |
| Union | 7,021 | 3,006 | 6,895 | 1,600 | 5,911 | 597 |
| Webster | 15,713 | 7,045 | 12,618 | 1,769 | 12,250 | 130 |
| West Carroll | 6,171 | 1,389 | 5,660 | 292 | 5,182 | 70 |
| West Feliciana | 1,632 | 2,235 | 1,272 | 0 | 1,303 | 0 |
| Winn | 6,790 | 2,590 | 6,449 | 1,430 | 6,393 | 1,093 |
| TOTAL | 212,273 | 107,446 | 161,069 | 25,361 | 162,427 | 10256 |

*must not be confused with a literacy test or the two treated as peers.* Under Louisiana law, any literacy qualification is met by the requirement that the applicant read to the registrar the Preamble of the United States Constitution. In fact, an applicant need write the Preamble only in his mother tongue, through the dictation of an interpreter if he cannot speak, read, or write English. La.Const. Art. VIII, § 1(c). For good measure, ability to fill out an application form is an additional test of literacy. Moreover, under another statute and provision of the State Constitution, until 1960 *all of the time Louisiana had an interpretation test it allowed illiterates to vote.*[82] (LSA–R.S. 18:36). In November 1962 the State carried 37,365 illiterates on the registration rolls.

We do not have before us a test having a rational relation with the proper governmental objective of giving the vote only to qualified persons. Despite assurances by state officials at the meetings of the registrars that this test measures "only native intelligence", the truth of the matter is that there is nothing in native intelligence that will enable those untutored in constitutional law to give a reasonable interpretation of a highly technical document containing such legal concepts as, for example, venue, due process, the requisites of a criminal indictment, appellate court jurisdiction, and jurisdictional amount. Whatever name the State elects to give to the test, it is not a test of intelligence or citizenship when it enables a registrar to flunk eight Negro school teachers while passing eight illiterate white persons.[83]

As it is administered and as it was designed to be administered, the Louisiana understanding and interpretation test bears no relation to reasonable voting requirements. If a registrar should require an applicant to interpret Article X of the Louisiana Constitution dealing with the distribution between State and parish of *ad valorem* severance taxes on sulphur on the one hand and oil and gas on the other hand, we would find it impossible to hold that an interpretation of this provision served a rational governmental interest in withholding the suffrage from unqualified voters. Short of a government of philosopher-kings,— and no one has ever described Louisiana government in such terms—there is just no correlation between an ability to interpret *any* section of the Louisiana Constitution a registrar may thrust at an applicant for registration and a legitimate State interest in an informed electorate.

The ugly intractable truth is, the nexus is with unlawful discrimination. The ineradicable vice vitiating any relation to a legitimate governmental objective is the raw power vested in the registrar. The unrestricted power which makes the registrars' discriminatory and arbitrary conduct possible comes from the words "understand" and "interpretation." "Understand" and "interpretation" are words without definite meaning in the law. Their purposive ambiguity is the key to the true reason for the test:

"The terms 'read', 'speak' and 'write', unlike the words 'understand' and 'explain' have considerable objective content, and the quan-

---

82. The distribution of literacy among the registered voters is revealing.

| | 1940 | 1960 |
|---|---|---|
| Number of white voters who write their names | 652,271 | 786,506 |
| Number of Negro voters who write their names | 848 | 116,676 |
| Number of white voters who make mark | 50,473 | 22,956 |
| Number of colored voters who make mark | 14 | 12,804 |

---

83. This bizarre result was reached in East Feliciana.

tum of administrative decision that could be employed within the framework of such terminology would seem to be negligible. In contrast, * * * in both Louisiana and Mississippi [a would-be] voter is required to give a 'reasonable interpretation' of the Constitution of the United States. The language employed in these tests is similar to that of the Alabama literacy amendment and, because of its vagueness, would appear equally censurable." Note, 49 Col.L.Rev. 1144, 1146 (1949).

The understanding and interpretation of anything is an intimately subjective process. A communication of that understanding is itself subject to the understanding or interpretation of the listener or reader. Even in an atmosphere of mutual cooperation and good will, it is often very difficult for one person to know that the other actually understands what is being said or done. As appears from the evidence, however, in many registration offices in Louisiana the relation between the Registrar and Negro applicants can hardly be described as mutually cooperative. As Senator Rainach and Mr. Shaw, officers of the State of Louisiana, candidly described it, the registration office in Louisiana is "the front line of the battle" to retain a segregated society.

Without help from Senator Rainach or Mr. Shaw—the customs of generations, the mores of the community, the exposure of the individual to segregation from the cradle make it difficult, if not impossible, for a registrar to evaluate objectively what is necessarily a subjective test. We are sensible of the registrar's difficulties —he must live with his friends—but we must recognize that his predilections weight the scales against Negroes and hinder fair administration of an interpretation test or a citizenship test. When neither the Constitution nor the statutes prescribe any standards for the administration of the test, the net result is full latitude for calculated, purposeful discrimination and even for unthinking, purposeless discrimination.

In Davis v. Schnell, S.D.Ala.1949, 81 F.Supp. 872, aff'd memo. 1949, 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093, a three-judge court (Circuit Judge McCord and District Judges Mullins and McDuffie) had before it the Boswell Amendment to the Alabama Constitution. The Court held (as we do in the case before us) that the test was invalid on its face and invalid as administered.

The Boswell amendment, adopted in 1946, permitted registration only of persons who could "understand and explain" any article of the Federal Constitution. The Court dealt at length with the meaning of the word "understand":

"As pointed out, 'understand' may mean to interpret. [Louisiana uses both words.] This meaning requires an exceedingly high, if not impossible, standard. The distinguished Justices of the Supreme Court of the United States have frequently disagreed in their interpretations of various articles of the Constitution. We learn from history that many of the makers of the Constitution did not understand its provisions; many of them understood and believed that its provisions gave the. Supreme Court no power to declare an act of Congress unconstitutional. An understanding or explanation given by the Supreme Court a few years ago as to the meaning of the commerce clause does not apply today. Among our most learned judges there are at least four different understandings and explanations of the Fourteenth Amendment to the Constitution as to whether it made the first eight Amendments applicable to state action. Such a rigorous standard * * * illustrates the completeness with which any individual or group of prospective electors, whether white or Negro, may be deprived of the right of franchise by boards of registrars inclined to apply this one of the innumerable meanings of such

an indefinite phrase. * * *" 81
F.Supp. at 877–878.

*Davis v. Schnell* was heard shortly after the adoption of the amendment. The Court was concerned therefore with only a few examples of arbitrary action and concentrated its discussion on the inherent potential for discriminatory and arbitrary administration. The Court held that the understanding clause violated the Fourteenth Amendment:

> "To state it more plainly, the board has the right to reject one applicant and accept another, depending solely upon whether it likes or dislikes the understanding and explanation offered. To state it even more plainly, the board, by the use of the words 'understand and explain,' is given the arbitrary power to accept or reject any prospective elector that may apply, or, to use the language of Yick Wo v. Hopkins, 118 U.S. 356, 366, 6 S.Ct. 1064, 1069, 30 L.Ed. 220, these words 'actually do confer, not a discretion to be exercised upon a consideration of the circumstances of each case, but a naked and arbitrary power to give or withhold consent * * *.' * * * *Such arbitrary power amounts to a denial of the equal protection of the law within the meaning of the Fourteenth Amendment to the Constitution* * * *." 81 F.Supp. at 878.

The Court also held that both the legislative purpose and the administration of the test violated the Fifteenth Amendment:

> "It, thus, clearly appears that [the Boswell] Amendment was intended to be, and is being used for the purpose of discriminating against applicants for the franchise on the basis of race or color. Therefore, we are necessarily brought to the conclusion that the Amendment to the Constitution of Alabama, *both in its object and the manner of its administration, is unconstitutional,*

*because it violates the Fifteenth Amendment. While it is true that there is no mention of race or color in the Boswell Amendment, this does not save it."* (Emphasis supplied.)

Referring to *Davis v. Schnell, in Lassiter v. Northampton Election Board* the Supreme Court has said:

> "In *Davis v. Schnell* * * * the test was the citizen's ability to 'understand and explain' an article of the Federal Constitution. The legislative setting of that provision and the great discretion it vested in the registrar made clear that a literacy requirement was merely a device to make racial discrimination easy."

The Fifth Circuit has recently applied the *Davis v. Schnell* rationale in an action by the United States under 42 U.S. C.A. § 1971(c) against the Board of Registrars of Dallas County, Alabama. United States v. Atkins, 1963, 5 Cir., 323 F.2d 733. In that case the district court held that the prior Board had discriminated against Negroes, the current Board had not. Section 181 of the Alabama Constitution provides that the boards of registrars, in determining the qualifications of applicants, use a questionnaire so worded that the answers would give information necessary or proper to enable the boards to pass upon the qualifications of the applicants. The predecessor section to Section 181 was "the understand and explain" clause struck down in *Davis v. Schnell.* There was "no set standard for the 'grading' of questionnaires." The Court of Appeals held that "this is precisely the sort of practice condemned in *Davis v. Schnell*" and granted an injunction against the current Board rejecting applicants for errors or omissions in the questionnaire until they presented to the court a "definite set of standards" which would meet the approval of the court.

The State of Louisiana itself, through its authorized legal advisory agency, the Louisiana Law Institute,[84] has questioned the constitutionality of the interpretation

---

84. The Louisiana Law Institute, composed of the State's most distinguished attorneys and law teachers, is chartered by the legislature as "an official advisory

test. Act 52 of the Louisiana legislature of 1946 directed the Louisiana Law Institute to prepare a draft or "projet of a Constitution for the State of Louisiana". In 1954 the work was completed and circulated by the State.[85] After a thorough study of the law, the Institute concluded that if the provisions of the Louisiana Constitution establishing an understanding and interpretation test were attacked in court, "Certainly if the same charges could be successfully made concerning the Louisiana provisions [as were made in *Davis v. Schnell*], they would be unconstitutional."[86] The Reporter commented that "although discrimination in administration was found [in Davis v. Schnell], the lower court * * * declared the provision unconstitutional *on*

*its face because it furnished no test or standard to control* administrative discretion". The Institute summarized its position as follows:

"1. The Institute in deleting these qualifications was influenced by the following considerations:

a. The doubtful constitutionality of the present provisions;

b. The arbitrary power they give to registrars of voters, since no objective criteria are provided; and

c. The authority given the legislature under the Projet to require additional educational qualifications."

law revision commission, law reform agency and legal research agency of the State of Louisiana". LSA–R.S. 24:201 (1950). See Smith, Role of Louisiana Law Institute, 16 La.L.Rev. 691 (1956); Tucker, The Louisiana Law Institute, 1 La.L.Rev. 139 (1938).

85. In 1956 the voters rejected a constitutional convention.

86. The Institute's comments on Davis v. Schnell are:

"It is clear that the constitutionality of the provisions listed above is now questionable. It is impossible to predict exactly what the supreme court may require in the future to strike down the 'understanding' and similar clauses. *In the Schnell case it was shown (1) that the purpose in adopting the amendment was to disfranchise the Negroes and (2) that, in fact, the amendment was administered in such a way as to disfranchise the Negroes.* [Emphasis added.] Certainly if the same charges could be successfully made concerning the Louisiana provisions, they would be unconstitutional.

"It also seems likely that the court would find a violation of the equal protection clause of the Fourteenth Amendment if only discriminatory administration were proved. [Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064 [30 L.Ed. 220] (1886); William [Williams] v. Mississippi, 170 U.S. 213, 18 S.Ct. 583 [42 L.Ed. 1012] (1898); and Trudeau v. Barnes, [5 Cir.] 65 F.(2d 563 (1933)]. Discrimination as to race or color in administration, together with disfranchisement of the Negro as the original pur-

pose of a constitutional provision, would seem to be contrary to the Fifteenth Amendment.

"Whether constitutional provisions of this character could now stand, even though there is no showing of malicious purpose in adoption or discrimination in administration, is subject to question. In two previous cases involving such 'understanding' clauses, one concerning the Mississippi constitutional provision [Williams v. Mississippi, 170 U.S. 213, 18 S. Ct. 583 [42 L.Ed. 1012] (1898)] and the other involving the Louisiana constitutional provision [Trudeau v. Barnes, [5 Cir.] 65 F.(2d) 563 (1933)], the court held that the constitutional provisions standing alone without proof of discrimination in administration were not unconstitutional as violative of the equal protection clause of the Fourteenth Amendment. However, in the *Schnell* case, although discrimination in administration was found, the lower court did not base its conclusion upon this; *rather, it declared the provision unconstitutional on its face because it furnished no test or standard to control administrative discretion.* Thus, it may be that now such provisions will be held unconstitutional in themselves regardless of whether or not discriminatory administration is found." 3 Projet of a Constitution for the State of Louisiana 40, 41 (1954).

In addition to deleting the interpretation test, the Projet also omits the requirements of (1) filling out the registration application form, (2) the good character clause, and (3) the clause requiring one to understand the duties and obligations of citizenship.

In Darby v. Daniel, S.D.Miss.1958, 168 F.Supp. 170, a three-judge court (Circuit Judge Cameron and District Judges Mize and Clayton) distinguished the Boswell Amendment from a Mississippi provision requiring voters to "understand * * * and give a reasonable interpretation" of "any section of the Constitution" of Mississippi. The Darby Court found that, unlike the Boswell Amendment, the Mississippi understanding test did not grant arbitrary power and that there was no evidence of its having been used arbitrarily. In Darby the Court declared that it could find no legislative purpose to discriminate and no proof showing racial discrimination.[87] Both are present in the instant case. But Darby's actual narrow holding was only that the plaintiff was not qualified and had not exhausted his state remedies.

We cannot see any substantial difference between "understand and explain" (the Boswell Amendment) and "understand * * * and give a reasonable interpretation". As pointed out earlier, the Mississippi understanding clause is the same test the Louisiana delegates to the Constitutional Convention of 1898 could not stomach, which was swallowed without gagging by the stronger-stomached delegates to the Convention of 1921.[88] The dicta in Darby v. Daniel must yield to the Supreme Court's holding in Davis v. Schnell.

If it may be said that Trudeau v. Barnes, 5 Cir. 1933, 65 F.2d 563, upholds the validity of the Louisiana interpretation test, that decision is no longer the law, in the light of Davis v. Schnell and the more recent cases. The Trudeau court, in 1933, was unable to find that the interpretation test was adopted for the purpose of disfranchising the Negro. However, in Trudeau there were important circumstances, not present here, which the court was compelled to consider in reaching a decision. (1) The case was an action at law against the registrar for damages. (2) The case was decided on a motion to dismiss, so that the Court did not have the benefit of evidence of a discriminatory purpose and proof of the discriminatory effect of the interpretation test. (3) At the time the case was decided, the law required the plaintiff to exhaust his administrative remedy. By express provision in the Civil Rights Act, it is no longer necessary for a plaintiff to exhaust state remedies.

Each registrar in Louisiana is the sole judge of whether to apply the interpretation test or not to apply it and whether an applicant qualifies. The judgment is made without guidance, without standards, without limitations imposed by law; the judgment is necessarily subjective. Thus the right to vote depends more upon the caprice of the registrar than upon the possession of measurable qualifications.

A year after the Convention of 1898 rejected the Mississippi understanding

---

87. In Darby the court relied strongly on Williams v. Mississippi, 1898, 170 U.S. 213, 18 S.Ct. 583, 42 L.Ed. 1012. That case did not involve a direct attack on the standards for registration. Williams was a murder case; the suffrage issue was collateral. The record in Williams, as in Trudeau, showed no proof of a discriminatory purpose and no discriminatory use of the test. Moreover, the relief sought was registration under the "understanding" standards rather than invalidation of them. See Comment, 72 Yale L.Jour. 770 (1963).

88. The delegates to the Constitutional Convention of 1921 fully understood that the Convention had adopted the Mississippi understanding clause. Thus, Frank J. Looney, an active member and prominent lawyer, wrote in 1925: "This is the clause known as the 'understanding clause' and has been passed on by the United States Supreme Court in the case of Williams v. Mississippi, 170 U.S. 213 [18 S.Ct. 583, 42 L.Ed. 1012]." Looney, Suffrage in the Constitution of 1921, 6 Loyola L.Jour. 75, 79 (1925). "With regard to suffrage the principal feature * * * is the addition of the 'reasonable interpretation' and 'understanding' provision of the Mississippi Constitution". Berdahl, The Louisiana Constitutional Convention, 15 Amer.Pol. Sc.Rev. 565 (1921). See also Footnotes 45 and 46.

clause, Thomas J. Kernan, an outstanding Louisiana lawyer and one of the delegates to the convention, pegged the understanding and interpretation test about as well as it could be pegged:

"The 'understanding clause' was objectionable for many reasons * *. The adoption of such a plan would have negatived the idea of a return to 'purer methods, wiser laws' in the matter of elections, which, in Louisiana, had grown to be a demand, second in importance only to that for the elimination of the negro from the electorate. *This 'understanding clause' fixes no standard of qualification for the franchise.* It is left to the discretion of the registration officer to select any one of the numerous articles of the Constitution as the test of the voter's 'understanding;' and *there are, therefore, as many different tests as there are articles in the Constitution. This arbitrary power, lodged with the registration officer, practically places his decision beyond the pale of judicial review; and he can enfranchise or disfranchise voters at his own sweet will and pleasure without let or hindrance.* As long as registration officers are mere men, endowed with the same qualities only as their fellow mortals, it will always be unsafe to intrust them with such absolute power. The Convention, in my opinion, acted wisely in refusing to adopt the 'understanding clause,'." Kernan, The Constitutional Convention of 1898 and Its Work, Proc. La.Bar Ass'n for 1899, 54, 59.

 ██ The orderly society our Constitution establishes does not permit one man to have uncontrolled power over his fellow citizens. When the State clothes a registrar with omnipotence in deciding the qualifications of voters, it has enacted "not a law, but an attempt to make the arbiter in such a case a law in himself." City of New Orleans v. Palmisano, 1920, 146 La. 518, 83 So. 789, 791. See also State v. Chisesi, 1937, 187 La. 675, 175 So. 453; City of New Orleans v. Levy, 1957, 233 La. 844, 98 So.2d 210; Banjavich v. Louisiana Licensing Bd. for Marine Divers, 1959, 237 La. 467, 111 So.2d 505. When a State constitution gives raw power to a registrar to grant, or to withhold registration as he sees fit, the constitution violates both the due process and the equal protection clauses of the Fourteenth Amendment.

Yick Wo v. Hopkins firmly established the principle that the unequal enforcement of a law will render the results of the enforcement void. In Yick Wo, convictions were overturned without a declaration that the ordinance itself was invalid, assuming possible nondiscriminatory enforcement. But the doctrine of nondiscriminatory enforcement of a law has never been limited to nullifying the effects of the law. Indeed, a Maryland case, extensively quoted in Yick Wo, concerned the invalidation of an ordinance granting unrestrained power to the city government to issue permits for boilers. Baltimore, etc. v. Radecke, 49 Md. 217. City of New Orleans v. Palmisano.

In sum, some laws may never win constitutional approbation, because they have no rational relation to a legitimate governmental objective and because the unrestrained discretion without standards, they grant an officeholder makes them incurably subjective, unreasonable, and incapable of equal enforcement. The understanding and interpretation test is such a law.[89] Although the vote-abridging purpose and effect of the test

89. A keen student of the South and the acknowledged leading authority in the field of Southern politics writes: "Tests supplementary to literacy—ability to understand, explain, or interpret the constitution— * * * [b]orn of a union of constitutional fraud and political ineptitude * * * must in their nature be cloaks for the arbitary exclusion of voters or tests for the possession of useless knowledge. * * * [I]f any test of understanding were applied at all to any substantial number of citizens of status, the registrars would be hanged

render it *per se* invalid under the Fifteenth Amendment, it is also *per se* invalid under the Fourteenth Amendment. The vices cannot be cured by an injunction enjoining its unfair application. The necessary relief, therefore, is to declare the test invalid and enjoin its enforcement in Louisiana.

## VII.

We come now to consideration of the new citizenship test.

By resolution of August 3, 1962, in compliance with Act 62 of 1962,[90] the State Board of Registration adopted a voter-qualification test, apparently tailored to fit this case should the interpretation test be held unconstitutional. The resolution and the statute do not, and could not, affect the constitutionality of the interpretation test. That test is still the law of the State; so there is no question of mootness. The new requirement rests on an understanding and interpretation of the Constitution of the United States as a whole. The statute requires the Board to prepare "an objective test of citizenship". The Board in its resolution of August third directed the registrars to use the new test, pointing out that Louisiana law prescribes as one of the qualifications for registration that the applicant "shall be of good character, and shall understand the duties and obligations of citizenship under a republican form of government". This qualification has been in the Constitution, unimplemented, since 1898.

The Board's "Instructions to registrars" require an applicant to draw one of ten cards. Each card has six multiple-choice questions, four of which the applicant must answer correctly. There are a total of forty-three different questions in various combinations. This test is considerably more difficult than the "tests" administered to white applicants in the past, in that it requires a comprehension of the theory of the American system of government and a knowledge of specific constitutional provisions.[91] The sort of answers shown by the evidence to have been accepted in the past from white applicants would be unacceptable now under a fair administration of the test. Considering Louisiana's unhappy position as the State with the highest rate of illiteracy and the lowest percentage of citizens with a high school education, the citizenship test can be regarded as a step forward only by those in favor of a severely limited representative government of guardians elected by a small, elite electorate.

to the nearest lamp post and no grand jury could be found that would return a true bill. Suffrage requirements that cannot be made at least to appear nondiscriminatory in their application will sooner or later fall before the constitutional ban on racial discrimination." Key, Southern Politics 577 (1949).

90. Act 62 of 1962 amended LSA–R.S. 18:-191 to provide that the Board of Registrars "shall prescribe and direct the registrars of voters to propound an objective test of citizenship under a republican form of government * * *." A constitutional amendment to the same effect was adopted at the state-wide general election held on November 6, 1962.

The provisions in the Louisiana Constitution and statutes setting out the interpretation test as a requirement for voter registration remain unchanged. The new constitutional provision amends

Article VIII, section 18 while the interpretation test is found in Article VIII, section 1(d); the statutory change adds the new requirement to LSA–R.S. 18:-191, leaving untouched LSA–R.S. 18:35, the provision containing the test under attack.

91. These are some of the questions. No. 2: "Limits are placed on the right to vote by the (a) National Government (b) States (c) Courts." No. 14: "The Articles of Confederation are (a) the Constitution we now have (b) a plan for State government (c) an early plan of government for the original 13 States". No. 16: "Our Constitution has been changed (a) by the President (b) by the Congress and the people (c) by the Supreme Court". No. 35: "The United States Supreme Court is made up of (a) 9 Justices (b) 6 Justices (c) 5 Justices.

It is no small constitutional problem to define "a republican form of government" and determine if the Board's new test measures fairly an applicant's understanding of the "duties and obligations of citizenship under a republican form of government." The Supreme Court had trouble defining a "republican form of government", or so it seemed to say.[92] We reserve judgment therefore on the constitutionality of the new examination. Although we need not pass on the constitutionality of the "citizenship test" itself, we must consider the constitutional effect of this new action on those who have been discriminated against in the past. The object of this suit is not only to prevent future injustices but to rectify past injustices.

In the twenty-one parishes which used the interpretation test, there are few Negroes registered. In all of the parishes this is a result of the policy of initially registering as many white persons and as few Negroes as possible. In some of the parishes it is also a result of past discrimination in purging the rolls of Negro but not white registrants, as a first step; and, as a second step, preventing the re-registration of Negroes (but not white applicants) by an arbitrary administration of the interpretation test. Moreover, we cannot overlook the inhibiting effect of discriminatory registration practices on Negroes everywhere in Louisiana who would otherwise have tried to register.

A major change in the standards of voting qualifications is usually followed by a general re-registration of all voters. This practice prevents previously registered voters, who are unacceptable under the new standards, from remaining on the rolls while those with equal or superior qualifications are denied suffrage. Thus, complete re-registration was used in 1898 to wipe clean the rolls and pre-vent the re-registration of Negroes under the new standards. Similarly, when the qualifications were formally altered in 1921, the State required the re-registration of all voters. Except in the parishes with periodic registration, there has been no complete re-registration since the interpretation test was resurrected in the middle fifties. In no parish has there been re-registration since the introduction of the new test. Of course, general re-registration would in large measure destroy the continuing usefulness of the past discriminations designed to keep Negroes off of the registration rolls. Yet the new test, or any other procedure more demanding than those previously applied to the white applicants, will have the effect of perpetuating the differences created by the discriminatory practices of the past; most of the potential white voters are on the rolls but few if any of the potential Negro voters are on the rolls. As in *Gomillion v. Lightfoot* and *Lane v. Wilson*, the necessary effect of the new law, regardless of its fair facade, is built-in unconstitutional discrimination.

The cessation of prior discriminatory practices cannot justify the imposition of new and onerous requirements, theoretically applicable to all, but practically affecting primarily those who bore the brunt of previous discrimination. An appropriate remedy therefore should undo the results of past discrimination as well as prevent future inequality of treatment. A court of equity is not powerless to eradicate the effects of former discrimination. If it were, the State could seal into permanent existence the injustices of the past.

A good example of the principle that the abolition of one variety of discrimination does not justify the imposition of another is *Lane v. Wilson*. After the Supreme Court in *Guinn* struck the grandfather clause from the Oklahoma

92. Pacific States Tel. & Tel. Co. v. Oregon, 1912, 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377. See also Minor v. Happersett, 1874, 21 Wall. 162, 88 U.S. 162, 22 L. Ed. 627; Texas v. White, 1868, 7 Wall. 700, 74 U.S. 700, 19 L.Ed. 227; Luther v. Borden, 1849, 7 How. 1, 48 U.S. 1, 12 L.Ed. 581; The Federalist 49 (Editor's Introduction; Wright Ed. 1961).

Constitution, Oklahoma required all qualified persons not registered at a time when that clause was in effect to register within twelve days or be permanently disenfranchised. Most of the eligible whites were already registered but most eligible Negroes were not. In declaring unconstitutional the second Oklahoma attempt to bar Negroes from the ballot box, the Supreme Court said:

"Exemption from this onerous provision was enjoyed by all who had registered in 1914. But this registration was held under the statute which was condemned in the Guinn case. Unfair discrimination was thus retained by automatically granting voting privileges for life to the white citizens whom the constitutional 'grandfather clause' had sheltered while subjecting colored citizens to a new burden." 307 U.S. 276, 59 S.Ct. 876, 83 L.Ed. 1281.

In *Guinn* and *Lane* no past wrongdoing could be imputed to the State because denial of the suffrage to Negroes was legal before 1866—the "freezing" date. The instant case cries louder for relief because the citizenship tests freeze the results of past *illegal* practices.

Recently, in Mississippi, a sheriff, as an ex-officio poll tax collector, had instituted a new policy requiring that individuals paying the poll tax for the first time see him personally. He maintained two offices and was seldom at either office. Speaking for the Fifth Circuit, Judge Bootle, sitting by designation, declared:

"This new policy, while purporting to apply to Negroes and whites indiscriminately, actually operates to the disadvantage of Negroes on account of their race, as did the previous instruction. Substantially all of the 5,099 white persons of voting age who were liable to pay a poll tax have been permitted to do so while not one of the County's 6,483 Negroes of voting age has been listed as paying the tax. Obviously a blanket requirement that all persons who have never paid the poll tax before, that being a relatively small percentage of white people and all Negroes, who now desire to pay their poll tax for the first time must see the Sheriff personally operates unequally and discriminatorily against the Negroes. * * * Sheriff Dogan's new instructions by necessary result re-creates and perpetuates the very discrimination which prevailed *under his former instructions and practices.*" United States v. Dogan, 1963, 5 Cir. 314 F.2d 767.

In United States v. Atkins, 1963, 5 Cir., 323 F.2d 733, the Court of Appeals for this Circuit, recently quoted Dogan with approval on freezing although it declined to apply the principle:

"We do not dispute the power of the federal courts to invoke the freezing principle to give relief when necessary. It has been used before in voting cases. * * *"

Insofar as freezing is concerned, *Atkins* is distinguishable from the instant case on the facts and on the relief sought. In *Atkins*, the Court of Appeals noted that (1) it would be feasible to purge the registration lists in Dallas County of "those persons proved by the appellant to have been registered by a procedure which does not meet the minimal requirements of State law"; (2) "[t]he procedure of the Registrars which would have the greatest freezing effect was the practice of not allowing rejected applicants to reapply", a practice the district court has now eliminated; (3) "other [discriminatory] practices soon will be eliminated"; (4) "The only remaining freezing effect could come as a result of differences of practices allowable within the zone of permissible interpretation of Alabama law", but "[w]here * * * or how strictly the Board will interpret Alabama law, is yet to be determined". In *Atkins*, the United States asked the Court to order the Board of Registrars "to register Negroes in the future who possess the qualifications required of whites during the period 1952–1960".

The Court objected to making "a permanent fixture in Dallas County" of practices violative of state law. Here, as will be developed later in the opinion, the relief does not have such an effect and is restricted in its application. Moreover, *Atkins* was a "pattern and practice" case under Section 1971 in which the district court held that the current Board of Registrars had not discriminated against Negroes, a finding undisturbed by the Court of Appeals. Finally, in *Atkins*, the question was whether a Board of Registrars should be required to violate a *valid* state law in the future because predecessor boards of that county had violated the *same* law in the past; here, the issue as to the citizenship test is whether a state may raise the standards for registration by enacting a new law which has the inevitable effect of freezing discrimination under an *unconstitutional* prior law. *A fortiori, Lane v. Wilson* squarely covers the case before this Court.

In United States v. Lynd, 5 Cir. 1962, 301 F.2d 818, cert. den'd, 1963, 371 U.S. 893, 83 S.Ct. 187, 9 L.Ed.2d 125, the Court entered a temporary injunction, pending appeal, restraining a Registrar from

> "* * * failing or refusing to give to Negro applicants the same privileges as to reviewing their application forms at the time they are filled out and advising Negro applicants of such omissions as appear on their forms as they are now *or heretofore have given to white* applicants under similar circumstances * * *."
> (Emphasis added.)

After this injunction pending appeal was issued, the Mississippi Legislature amended Section 3213 of the Mississippi Code to make mandatory the requirement that applicants fill out their application form without assistance. The amendment adds the requirement that no application can be approved or applicant registered unless all the blanks on the form are "properly and responsively" filled out by the applicant. July 15, 1963, the Court extended the injunction, pending further proceedings in the District Court, and held the defendant in civil contempt. The Court's two orders of July 15, 1963, restrained the defendant in precisely the same language as that quoted above.

Again, in United States v. Penton, M.D.Ala.1962, 212 F.Supp. 193 the district court found that while prior to February 1961, the Board of Registrars of Montgomery County, Alabama, had not required perfection in completing the application form, as of that date "the Board raised the standard to require a perfect application." 212 F.Supp. at 197. During the earlier period the Board had used the application form "as a tricky examination or test" for Negroes only, and "[i]f a Negro applicant failed to meet the standard required of him, he was denied registration regardless of whether the error or omission on the form was formal, technical, or inconsequential." White applicants, unlike Negroes, had been assisted in manifold ways. With respect to past and future Negro applicants, Judge Johnson applied "standards consistent with past practices." Id. at 200 of 212 F.Supp. *He enjoined the defendants "from using * * * different and more stringent qualification requirements for registration * * * than * * * [those] used by the Board * * since at least January 1, 1956."* United States v. Penton, (M.D.Ala., 1962), 212 F.Supp. 193.

Ross v. Dyer, 5 Cir. 1962, 312 F.2d 191, presented an analogous situation. The Court had before it the brother-and-sister rule of the Houston public school system, a long-standing rule requiring a child to attend the school which his older siblings attended. The rule was one "of long standing applied to white and Negroes alike". This Court observed:

> "On the basis of the evidence which showed it to be a rule of long standing applied to white and Negroes alike, the District Judge in his memorandum opinion reasoned that 'the colored plaintiffs do not seek the same treatment as is afforded white

students, to which they are entitled; in fact, they seek a different, and superior, treatment, by reason of their race. The law does not grant them this.' But we think that logic alone is insufficient to overcome the practical effect of this rule which as to some Negro families perpetuates a segregated system despite the plain purpose of the stair-step plan to ameliorate it. That it applies equally to white and Negro overlooks the fact that as to one group, *compulsory attendance at certain schools has been the result of unconstitutional discrimination. The purpose of the court decree is to eradicate that unconstitutional deprivation of equal protection, no matter how felt or manifested.*" (Emphasis added.)

In insisting that registrars not apply now to Negroes a difficult test which was never applied to white registrants, there is no more compulsion of state officials to violate state law here than there was in *Yick Wo.* Enforcement of the citizenship test at this point would be just as discriminatory against Negroes as enforcement of the San Francisco licensing ordinance directed against Chinese laundrymen would have been in *Yick Wo.* The validity of the ordinance requiring a license for a laundry operated in a wooden building could be asserted only after a relicensing of all laundries on a nondiscriminatory basis. Allowing white laundrymen who had been favored in the past to remain licensed would have perpetuated the discrimination. Thus, although the application of the ordinance was enjoined, the ordinance itself was unconstitutional in the sense that its enforcement had the necessary effect of violating the constitution until the State revoked all outstanding licenses and thereafter issued new licenses nondiscriminatorily.[93] So it is here.

■ In short, the obligation of the State to abolish its system of racial discrimination in voting registration is not met simply by a process of applying new and higher standards to all future applicants. The new tests discriminate against Negroes of voting age by subjecting them to standards to which the registered applicants (most of whom are white) were not subjected. The promise of evenhanded justice in the future does not bind our hands in undoing past injustices.

## VIII.

This brings us to the question of fashioning the necessary remedy.

■ The power of Congress to adopt Civil Rights measures for protection of the electoral process against debasement by discrimination is expressly granted in the Fifteenth and Fourteenth Amendments. It is no housekeeping power. The sweep of the "appropriate legislation" clause is no less than the sweep of the "necessary and proper" clause. The protection of the right to vote, without regard to race, is important to the individual, but the Nation has the paramount interest in the integrity of the electoral process. These considerations argue against a grudging, narrow remedy. So that the will of Congress will be clear to the courts, Section 1971(e) expressly states:

"This subsection shall in no way be construed as a limitation upon the existing powers of the court."

Thus, in addition to the specific remedy provided in the Civil Rights Act, courts retain an undiminished authority to grant suitable equitable relief that will both rectify past inequities now, without delay, and will prevent future inequities. See State of Alabama v. United States, 5 Cir. 1962, 304 F.2d 583, aff'd 1962, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112.

Remedies suited to past litigation are not appropriate here for several reasons. (1) It is impracticable, if not impossible, and in any event it would create hardships, generate endless litigation, and

---

93. See Comment, The Federal Voting Referee Plan, 72 Yale L.Jour. 770, 782–84 (1963).

dislocate registration offices, if a wholesale attempt were made to purge the rolls of white persons improperly registered. (2) It would be extremely difficult to establish who was unconstitutionally purged for failing to take the interpretation test. (3) It would be next to impossible to establish which qualified Negroes were rejected for failure to understand or interpret a constitutional provision to the satisfaction of the registrar, because in many parishes inadequate records are maintained by the registrars. (4) It is completely impossible to ascertain how many and which qualified Negroes were deterred from seeking registration, knowing that they had no chance of succeeding, since other qualified Negroes were kept off the rolls by the practice of racial discrimination. In many respects, the last factor is the most important:

> "Discrimination by a registrar is especially harmful because it is the most effective method for denying the right to vote: it denies the right to vote before an individual has the chance to exercise it, and it bars not only the individual concerned from all elections but inhibits other qualified voters from running the guantlet of discriminatory and humiliating practices by a registrar and his deputies." United States v. Manning, W. D.La.1963, 215 F.Supp. 272, 288.

■■■ A nondiscriminatory re-registration of all voters in the State would be the only completely fair and effective means of clearing away the effect of the interpretation test and of applying the new citizenship test. In a general registration the State could require any new, reasonable, non-discriminatory qualifications. However, this Court adheres to the principle that only to the extent clearly necessary should federal courts interfere with established state and local procedures. Accordingly, as to the citizenship test, we restrict our order to the twenty-one parishes in which the interpretation test was used and we cast our order so as to afford an option to the State. In any of the twenty-one parishes where the interpretation test

was used, there need be no general re-registration. However, until there is a general re-registration of all voters in a parish where the test was used, or until the discriminatory effect of the test has been vitiated to the satisfaction of the court, we enjoin the use of the citizenship test. We narrow our order further, in the interest of equalizing the qualifications for registering, by restricting the injunction against the use of the citizenship test to the registration of those persons who were of voting age and who had the required residence in the parish prior to August 3, 1962; that is the period in which they were exposed to discrimination.

This is a suit in equity. Its purpose is not to punish Louisiana for past activities. Such a purpose would be presumptuous on the part of the Court and offensive to principles of American federalism. Neither is it merely to prevent continued enforcement of unconstitutional provisions of Louisiana law. The prime purpose is to provide a remedy for a *federally* protected right by giving equitable relief: opening the rolls for those to whom the rolls were illegally closed, those who were directly discriminated against by rejection of their applications and those who were inhibited from attempting to register because of known humiliating discriminatory practices of registrars. Finally, we repeat that this decision does not touch upon the constitutionality of the citizenship test as a state qualification for voting. Our order forbids enforcement of the citizenship test until Negro applicants can be judged by the same standards used in qualifying those persons already registered. In that sense the court is cooperating with the State in laying a predicate for the fair application of a voting qualification which the State is now endeavoring to convert into an objective test with ascertainable, although unusually high, standards.

## IX.

We summarize our holding. The Court holds that the interpretation test is un-

constitutional because of its unlawful purpose, operation, and inescapably discriminatory effect. We enjoin its use in Louisiana. To make this decree effective and to exorcise past discrimination, the Court enjoins the use of the "citizenship test" in the Parishes of Bienville, Claiborne, DeSoto, East Carroll, East Feliciana, Franklin, Jackson, LaSalle, Lincoln, Morehouse, Ouachita, Plaquemines, Rapides, Red River, Richland, St. Helena, Union, Webster, West Carroll, West Feliciana, and Winn as to all persons of voting age who had the requisite residence in the parish before August 3, 1962. These are parishes where the registrars used the interpretation test. We enjoin the use of the citizenship test in the named parishes until there has been a general re-registration of all voters in a named parish, or until it has been shown, to the satisfaction of the court, that the interpretation test has lost its discriminatory effect in the parish.

This Court retains jurisdiction for the purpose of allowing the United States to prove and the State to disprove that the interpretation test was used in any of the forty-three parishes not named in the Court's decree, *and for other purposes.*

Formal findings of fact and conclusions of law will be entered at a later date.

WEST, District Judge (dissenting).
I respectfully dissent. Reasons to be assigned.

WEST, District Judge (dissenting):
When the majority decision was filed in this case, I announced that I dissented and would assign reasons therefor. This Three Judge Court originally had before it only the question of the constitutionality of Louisiana's constitutional interpretation test, LSA–Const. of 1921, Art. VIII, Sec. 1(d) and LSA–R.S. Title 18, Sec. 35, as used to determine voter qualifications. After this matter had been briefed and submitted, the Government suddenly injected another issue, i. e., the question of the constitutionality of Louisiana's new citizenship test, LSA–R.S. 18:191, as amended by Act 62 of 1962, as a State qualification for voting. I objected to the Court's considering the question of the constitutionality of the new citizenship test on the grounds that no "case or controversy" had arisen thereunder, and that therefore, the question of its constitutionality was not properly before the Court at this time. However, the majority of the Court decided otherwise, and has now held that the constitutional interpretation test, as provided for in Art. VIII, Sec. 1(d) of the La.Const., and in LSA–R.S. Title 18, Sec. 35, is *"per se* invalid under the Fifteenth Amendment", and that "it is also *per se* invalid under the Fourteenth Amendment". The majority further holds that "[t]he vices cannot be cured by an injunction enjoining its unfair application". As to the lately injected issue concerning the constitutionality of the citizenship test, the majority specifically state that "[T]his decision does not touch upon the constitutionality of the citizenship test as a state qualification for voting", but then proceed to forbid the enforcement or use of that test until the State "satisfies this Court" that what it considers "errors of the past" have been corrected.

The majority opinion, including footnotes, comprises some 93 mimeographed pages, most of which is completely immaterial to a decision of this case. When the majority of the Court finds that the constitutional interpretation test is *"per se* invalid"*, there is, of course, no reason to delve into the past history and usage of the test. For an act to be *"per se"* invalid, it must be invalid in itself; it must be invalid when taken alone; it must be inherently invalid; and it must be invalid in itself without reference to other matters. See Black's Law Dictionary, Fourth Edition. Consequently, if the act is, as the majority holds, invalid *per se,* then it must be invalid on its face, and in itself, and thus the question of the method of its administration is wholly immaterial.

That the constitutional interpretation test used by Louisiana is not, however, "per se invalid" becomes quite clear when viewed in light of prior holdings of the United States Supreme Court. It is sometimes difficult to decide whether to rely on the law as the Supreme Court interpreted it a few years ago, or to rely on it as interpreted last week, or to speculate on how they might interpret it tomorrow. However, in this instance, relative to a citizen's right of suffrage, I prefer to believe the law to be as interpreted by the United States Supreme Court on many occasions in the past. In rejecting the proposition that the Fourteenth Amendment added the right to vote to the privileges and immunities of citizenship, the Supreme Court, in Minor v. Happersett, 21 Wall. 162, 177, 88 U.S. 162, 177, 22 L.Ed. 627, said:

"Certainly, if the Courts can consider any question settled, this one is. For nearly 90 years the people have acted upon the idea that the Constitution, when it conferred citizenship, did not necessarily confer the right of suffrage. If uniform practice, long continued, can settle the construction of so important an instrument as the Constitution of the United States confessedly is, most certainly it has been done here. Our province is to decide what the law is, not to declare what it should be."

Then, in United States v. Reese, 92 U.S. 214, 23 L.Ed. 563, 564, in disposing of the argument that the right to vote was conferred by the Fifteenth Amendment to the United States Constitution, the Supreme Court said:

"The Fifteenth Amendment does not confer the right of suffrage upon anyone."

And then, in McPherson v. Blacker, 146 U.S. 1, 39, 13 S.Ct. 3, 36 L.Ed. 869, the United States Supreme Court once more recognized the fact that it was within the province of the State, and not the Federal Government, to determine voter qualifications. In the course of its opinion, it said:

"The right to vote intended to be protected refers to the right to vote as established by the laws and constitution of the State."

In a long line of unbroken jurisprudence beginning in 1874, the United States Supreme Court has consistently recognized that the privilege of voting is conferred upon citizens by the States, and that the United States Constitution does not confer upon anyone the privilege of suffrage. In Pope v. Williams, 193 U.S. 621, 632, 24 S.Ct. 573, 575, 48 L.Ed. 817, the Court said:

"The privilege to vote in any State is not given by the Federal Constitution, or by any of its amendments. It is not a privilege springing from citizenship of the United States. * * * It may not be refused on account of race, color or previous condition of servitude, but it does not follow from mere citizenship of the United States."

Therefore, insofar as the majority opinion seems to indicate that somehow, the right to vote is guaranteed by the United States Constitution, I respectfully suggest that the majority is in error. In view of the fact that the privilege of voting emanates entirely from the States, and not from the Federal Government, and in view of the fact that the judicial function is properly exercised only by indicating whether or not the State has transcended provisions of the Federal Constitution, it follows, just as the night follows the day, that the role of the Federal Court is not to direct the State in the procedures to be used in registering voters. The Supreme Court has held that the "conditions under which the right of suffrage may be exercised" lies with the States. Lassiter v. Northampton Board of Elections, 360 U.S. 45, 50, 79 S.Ct. 985, 989, 3 L.Ed.2d 1072.

The majority opinion is so lengthy, and involves so many extra-judicial dis-

courses, that it is rather difficult to determine whether it holds that the State constitutional provision and the State Statute establishing the constitutional interpretation test are unconstitutional in themselves, or whether it holds merely that these State laws have been unconstitutionally administered. I must conclude, however, that the majority intended to hold, as they stated near the close of their opinion, that the constitutional interpretation test is *"per se* invalid under the Fifteenth Amendment, and it is also *per se* invalid under the Fourteenth Amendment" of the United States Constitution. This being the case, the prior history of voting requirements in Louisiana, as discussed at great length in the majority opinion, is completely immaterial. If these laws are invalid *per se*, then it matters not how they were administered. No method of administration could validate a law which is invalid *per se*. If, however, the majority intended to hold, contrary to their specific statement concerning invalidity *per se*, that the test is unconstitutional because of improper application, then, in view of their ultimate order in connection with the State's use of the new citizenship test, it is difficult to understand why they did not merely enjoin the improper application of the constitutional interpretation test in the twenty-one Parishes where they found that it had been improperly applied. As will later be noted, they had no hesitancy in dividing the State into sections and holding that the new citizenship test may be applied in some Parishes of the State while it may not be applied in other Parishes. In line with this reasoning, if the constitutional interpretation test is bad only because of its improper use, then the improper use should have been enjoined only in the twenty-one Parishes where it had been improperly applied, and the remaining Parishes of the State should not have been interfered with in their use of that test. If, as stated by the majority, they actually found that the constitutional interpretation test was "invalid per se", they need only to have said so, and then, the application thereof becomes completely irrelevant because as heretofore pointed out, there is no way that an unconstitutional statute may be constitutionally applied. On the other hand, if the statute itself is per se constitutional, then I cannot agree that the "vices cannot be cured by an injunction enjoining its unfair application". I believe that a Court should be most reluctant to declare unconstitutional the statutes and constitutional provisions of a State, and should do so only when the statute and/or the constitutional provision involved is clearly in contravention of the United States Constitution. In Cummings v. Merchants National Bank, 101 U.S. 153, 25 L.Ed. 903, the United States Supreme Court held that a law is not to be held unconstitutional merely because of unfaithful administration. It held that a statute, valid as to one set of facts, may be invalid as to another. That is, its application may be valid or its application may be invalid, notwithstanding the constitutionality of the statute itself. In Kansas City Southern Ry. Co. v. Anderson, 233 U.S. 325, 34 S.Ct. 599, 58 L.Ed. 983, the Supreme Court considered and strongly rejected the contention that to hold that a statute has been unconstitutionally applied under one specific set of facts is tantamount to holding that the statute itself is invalid.

I must therefore respectfully disagree with both the findings and the conclusions of the majority insofar as the validity of the constitutional interpretation test as used in the State of Louisiana is concerned. While it may well be that there have been many instances of improper applications of that test, nevertheless, such improper applications do not, in my opinion, render the laws themselves unconstitutional. If, as I believe to be the case, the constitutional interpretation test is not unconstitutional per se, then only the improper application of the test should have been enjoined. I prefer to believe that the

Supreme Court of the United States meant what it said in the cases which I have cited, and in the many, many other cases that might have been cited to the same effect, namely, that the right remains with the States to decide and declare the requirements for voter registration. I prefer to believe that the function of the Court is merely to decide, in each specific case, whether or not the State has transcended the prohibitions contained in the United States Constitution, and if such is found to be the case, to order, by injunction, if necessary, the termination of such discriminatory practices. I do not believe that it is a proper function of the Court to establish by decree the qualification requirements of voters in the State of Louisiana. That, in my opinion, is precisely what the majority of the Court in this case does.

After concluding that the constitutional interpretation test is "invalid per se", the majority then proceed to a consideration of the validity of the new citizenship test, despite the fact that there were no allegations, nor could there be, that the citizenship test was either unconstitutional or improperly applied. Indeed, the majority specifically states that it does not "touch upon the constitutionality of the citizenship test as a state qualification for voting", but then proceeds to prohibit its use in twenty-one Parishes in the State of Louisiana. It is too elementary to require citation of authority that a statute properly passed by a State Legislature is presumed to be constitutional until such time as it is found to be unconstitutional. This Court has not found the citizenship test to be unconstitutional, and thus, it must, of course, be presumed to be constitutional. If the test is, in fact, constitutional, as it must be considered to be in light of the Court's failure to find it unconstitutional, then, it is a complete mystery to me where the Court finds its authority to enjoin its use. If the majority has found that the constitutional interpretation test is unconstitutional because of its improper use, a conclusion

with which I strenuously disagree, then by the same token, I suppose, they could have found that the citizenship test is unconstitutional because of improper use. However, the Court does not find that the citizenship test has been improperly used, and in fact, they have not found it to be unconstitutional in any way whatsoever. Nevertheless, in spite of this fact, the majority takes the position that the use of this new test in the twenty-one Parishes where they considered the constitutional interpretation test to have been improperly applied, would result in continued discrimination unless all voters were purged from the rolls and a complete new re-registration of all voters, using the new citizenship test, were accomplished. The majority decrees that the new citizenship test may not be used "until the discriminatory effect of the test has been vitiated to the satisfaction of the court". In other words, it would seem that in order to comply with this order, the new citizenship test, even though constitutional in every respect, may not be used until the case of every single voter on the rolls in twenty-one Parishes has been submitted to the Court for a determination of whether or not each individual voter has been properly registered to vote, without discrimination. I simply cannot agree that this is a function properly within the ambit of the authority of this Court. Anyone has a right to claim discrimination, and when discrimination has been claimed, he has a right to his day in court. But until such a case or controversy has been presented, the Court simply has no right to intervene. The majority opinion states: "The ordered society our Constitution establishes does not permit one man to have uncontrolled power over his fellow citizens. When the State clothes a registrar with omnipotence in deciding the qualifications of voters, it has enacted 'not a law, but an attempt to make the arbiter in such a case the law in himself.'" The majority opinion would merely refuse to allow the registrar to be "a law in him-

self", and substitute, in his stead, this Court. This opinion can have no other effect than the taking over by this Court of the functions of the State when it comes to determining the qualifications required for voter privileges. The majority opinion further states: "[T]his Court adheres to the principle that only to the extent clearly necessary should federal courts interfere with established state and local procedures." I can only say that if the majority means what it says in this statement, it must surely have failed to read its own opinion. The majority opinion says, in effect, that whenever a State wishes to alter or improve its voting requirements, it may do so only if it has a complete re-registration of everyone on the rolls throughout the entire State. This proposition has been rejected by the Fifth Circuit Court of Appeals in United States v. Atkins, et al., 323 F.2d 733 (1963). The majority opinion attempts to distinguish the present case from the Atkins case, but in my opinion fails completely to do so. The Atkins case specifically rejects the proposition that a State may not alter its voting requirements without re-registering all voters in the State. They try to distinguish Atkins on the grounds that in that case the question was whether a Board of Registrars should be required to violate a *valid* State law in the future because a predecessor board of that county had violated the *same law* in the past. They then go on to say that the difference between that case and the present case is that the issue here is whether a State may raise the standards for registration by enacting a new law which has the necessary, inescapable effect of freezing discrimination under an *unconstitutional* prior law. They fail to recognize the fact that the law establishing the constitutional interpretation test used by the State of Louisiana and under which the majority now holds there were instances of discrimination, was not an "unconstitutional law" until this present decision was handed down. The very same law had been specifically held to be constitutional in the

case of Trudeau v. Barnes, 65 F.2d 563 (C.A.5 1933). All action by the State of Louisiana taken pursuant to that law was, prior to the filing of this decision, taken pursuant to a statute which the Federal Court, Fifth Circuit, had specifically held to be constitutional. In the Trudeau case the Court said:

"It is at once apparent that the clause of the State Constitution which is under attack applies to all voters alike, denies to none of them the equal protection of the laws, does not undertake to deny or abridge the right of citizens of the United States to vote on account of race, color, or previous condition of servitude. It is difficult to conceive how this clause can be said to violate either the Fourteenth or the Fifteenth Amendment. It lays down but one test, that of intelligence, which applies uniformly and without discrimination to voters of every race and color. * * * The Louisiana Constitution protects every citizen who desires to register from being arbitrarily denied that right by the registrar of voters by giving the applicant a right to apply without delay and without expense to himself to the trial court for relief, to submit his qualifications to vote to a jury, and to have them finally passed upon by an appellate court. It is idle to say that the defendant as registrar had the arbitrary power to deny plaintiff the right to vote. We cannot say, and refuse to assume, that, if the plaintiff had pursued the administrative remedy that was open to him, he would not have received any relief to which he was entitled. * * * *"

Consequently, the distinction attempted to be drawn by the majority to distinguish the Atkins case is simply not valid. The effect of the majority order in this case, that the State of Louisiana may not use the new citizenship test in the twenty-one Parishes involved, is to order the State to violate an existing, valid law un-

til this Court tells them that they need no longer violate it. The citizenship test, as of now, is valid and has not been held invalid by any court, including this one. Therefore, for this Court now to order the State to refrain from using that test is to order them to violate a valid existing law of the State of Louisiana. In my judgment, the opinion of the majority in this case is just another example of the "personal decreeing" so bitterly criticized by Judge Hutcheson in his dissenting opinion in Lee v. United States of America, (1963), 5 Cir., 322 F.2d 770. I concur completely with the remarks of Judge Hutcheson contained therein.

In brief, I cannot sanction the take over by this Court of the functions of the State whereby this Court attempts to establish, and administer, as well as to adjudicate the State laws relative to voter registration. I believe that this Court should confine its activities to the judicial determination of cases and controversies as obviously contemplated by the limited jurisdictional grant contained in the United States Constitution

I can do no more than to concur with Judge Bell's dissent in Davis v. Board of School Commissioners of Mobile County, 322 F.2d 356, 362 (C.A.5 1963), when he said: "Therefore, I must dissent * * with the admonition that more constitutional rights will be lost than gained in the long run by departure from procedures which have stood the test of time, and which are a part of due process of law as we have heretofore known it," and to concur with Judge Cameron's dissent in Sharp v. Lucky, 252 F.2d 910, 924 (C.A.5 1958), wherein he said: "This sad epoch in our history [post Civil War] was fomented in no small part, by well-intentioned men in too much of a hurry."

I must, for these reasons, respectfully dissent.